Commonwealth, Appellant, *v.* DeWitt and Sellman.

Argued March 28, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Ralph B. D'Iorio,* Assistant District Attorney, with him *William R. Toal, Jr.,* First Assistant District Attorney, and *Stephen J. McEwen, Jr.,* District Attorney, for Commonwealth, appellant.

*John M. Gallagher, Jr.,* with him *Alexander A. DiSanti,* and *Richard, DiSanti & Hamilton,* for appellees.

OPINION BY SPAETH, J., December 11, 1973:

This is an appeal by the Commonwealth from a pretrial order suppressing evidence.

In the motion to suppress, appellees stated certain facts that appellant in its answer admitted to be true. These facts and the testimony presented at the hearing on the motion may be summarized as follows: On July 26, 1971, a package mailed from Morocco and addressed to one J. Sellman, at 1108 Ormond Avenue, Drexel Hill, Pennsylvania, was given a customs examination in the Port of New York by personnel of the United States Treasury Department, Bureau of Customs. The package contained a table with a false top, under which three pounds of hashish were discovered. The package was delivered to the post office at 30th Street, Philadelphia. There another customs agent, who had been informed by the New York authorities that the package contained narcotics, removed the hashish, treated it with fluorescent grease, replaced it under the false table top, and rewrapped the package. A search and seizure warrant was obtained, and the package was delivered to the Sellman residence. About half an hour after delivery, the police, pursuant to the warrant and accompanied by the customs agent, entered the residence. Defendants were inside. The agent "passed an ultra-violet light over the hands" of defendants. The light "indicat[ed] . . . that they had handled the pretreated hashish. . . ." The police, however, did not find the hashish until six hours later, when a police dog was brought to sniff it out. When the hashish was found, defendants were arrested.

On defendants' motion to suppress, the hearing judge held that the search and seizure warrant had been properly issued and executed. These conclusions are supported by the record and by the authorities cited in the judge's opinion. The judge also held that the evidence that there was grease on defendants' hands had to be suppressed and that the hashish could not be offered in evidence against defendant Robert DeWitt.

In the motion to suppress, appellees challenged the New York customs search, which first revealed the hashish. The hearing judge made no explicit finding on this issue but did state that the package moved as bulk mail. After the judge's opinion was issued, the Pennsylvania Supreme Court handed down *Commonwealth v. Dembo*, 451 Pa. 1, 301 A. 2d 689 (1973), which held that fourth class mail, such as the package involved in this case, is not exempt from the requirements of the Fourth Amendment. Appellees argue that *Dembo* destroys the legality of the New York customs search. The New York search, however, was proper on another basis.

One of several statutes authorizing customs examinations is 19 U.S.C. §482 (1970), which reads as follows: "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandize on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial." The constitutionality of many §482 searches by custom officials rests on the doctrine that exempts border searches from

the requirements of the Fourth Amendment. Under this doctrine, "[a] customs officer has the unique power to stop a person at an international entry point and to conduct a 'border search' without having a search warrant or even having a probable cause to believe the person has committed a crime. Murgia v. United States, 285 F. 2d 14 (9 Cir. 1960), cert. denied, 366 U.S. 977, 81 S. Ct. 1946, 6 L. Ed. 2d 1265 (1961); Rodriguez-Gonzalez v. United States, 378 F. 2d 256 (9 Cir. 1967); Thomas v. United States, 372 F. 2d 252 (5 Cir. 1967); see, e.g., Denton v. United States, 310 F. 2d 129 (9 Cir. 1962). Typically, mere suspicion of possible illegal activity within their jurisdiction is enough 'cause' to permit a customs officer to stop and search a person [citations omitted]. This is not to say that the restrictions of the Fourth Amendment that searches and seizures may not be unreasonable are inapplicable to border stops and searches conducted by customs officials. On the contrary, border stops and searches, like all stops and searches, are restricted by the requirement that they be reasonable . . . , but what is reasonable, of course, will depend on all the facts of a particular case." *United States v. Glaziou,* 402 F. 2d 8, 12 (2d Cir. 1968), *cert. denied,* 393 U.S. 1121 (1969). The basis for this exemption for border searches is "found in the fact that the primordial purpose of a search by customs officers is not to apprehend persons, but to seize contraband property unlawfully imported or brought into the United States." *Alexander v. United States,* 362 F. 2d 379, 382 (9th Cir.), *cert. denied,* 385 U.S. 977 (1966). The border search doctrine has been applied to examinations of mail coming into this country from abroad. *United States v. Doe,* 472 F. 2d 982 (2d Cir.), *cert. denied,* 411 U.S. 969, 93 S. Ct. 2160 (1973); *United States v. Beckley,* 335 F. 2d 86 (6th Cir. 1964); *United States v. Swede,* 326 F. Supp. 533 (S.D. N.Y. 1971). For such purposes, a mail sorting room at a port of entry is treated

as a border crossing. *United States v. Swede, supra; United States v. Sohnen,* 298 F. Supp. 51 (E.D. N.Y. 1969). Accordingly, the New York customs search of the bulk mail package containing the table was proper: New York is a port of entry, and customs agents there could reasonably have suspected that the package contained "merchandise which is subject to duty" or matter which was "introduced into the United States in any manner contrary to law." 19 U.S.C. §482.

Appellees, in a supplementary brief to this court, question for the first time the legality of the customs agent's search at the Philadelphia Post Office. This was not a border search; a border search had already been conducted a week earlier at the port of entry, New York. The agent, however, had a "factual basis" for believing that the package he opened had been in international mails, *i.e.,* from the package wrappings, *United States v. Valen,* 348 F. Supp. 1163, 1166 (M.D. Pa. 1972), and had probable cause to believe that the package contained illegal contraband because of the information he had received from the New York customs authorities. Given these facts, his warrantless search was probably lawful under §482 and the Fourth Amendment. *United States v. Epstein,* 240 F. Supp. 84 (S.D. N.Y. 1965). *Cf. Almeida-Sanchez v. United States,* 406 U.S. 944, 41 L.W. 4970 (1973). In any event, Pa. R. Crim. P. 323(d) requires that an application for the suppression of evidence "state . . . the specific constitutional grounds rendering the evidence inadmissible." Because we are told of no reason why appellees did not raise the issue of the legality of the Philadelphia search before now, we shall not decide that issue now. *Commonwealth v. Turra,* 442 Pa. 192, 195, 275 A. 2d 96, 97 (1971).

In suppressing the evidence of the grease the hearing judge reasoned that passing the ultraviolet light over defendants' hands was a "search", which was ille-

gal because the warrant authorized only the search of the Sellman residence.

The test of what constitutes a search within the Fourth Amendment is whether the police have "violated the privacy upon which [the defendants] justifiably relied." *Katz v. United States*, 389 U.S. 347, 353 (1967). In order to decide whether there has been such a violation, it is necessary to consider all the circumstances, especially the nature of the item observed and the type of activity by which the observation was made. *Commonwealth v. Soychak*, 221 Pa. Superior Ct. 458, 289 A. 2d 119 (1972), and *Commonwealth v. Hernley*, 216 Pa. Superior Ct. 177, 263 A. 2d 904 (1970), illustrate how this test is applied.

In *Commonwealth v. Soychak, supra,* the police officer gained access to the roof of the defendant's building and manipulated the louvres of an exhaust fan. The room into which the officer was thus able to see was locked and protected by a guard at the door, indicating that the defendant had attempted to maintain his privacy. The trespass onto the roof, the manipulation of the louvres, and the defendant's own actions, when all taken together, led this court to hold that the officer's observation was a search. In *Commonwealth v. Hernley, supra,* where there was no trespass or manipulation of the defendant's property, and where the defendant had made no attempt to cover his windows, it was held that the officer did not make a search by standing on a ladder on abutting property and peering into the defendant's window with binoculars.

In the present case, the officers were in the house pursuant to a valid search warrant, at a time closely coordinated with the delivery of the contraband. Nor did the officers engage in any activity that might be regarded as high-handed. Although it is true that the warrant did not specifically authorize the officers to search any person, it did authorize them to search the

premises and to seize "Dangerous drugs and /or Narcotics and correspondence, shipping labels, or documents connected with the use, possession, or sale of dangerous drugs and/or Narcotics," and also "to make diligent search (on the premises described above), for the property described above, and if you find the same or any part thereof, you are then to secure the same, and bring the same, and also the person or persons in whose custody and possession you find the same, before the undersigned authority. . . ." It would not be unreasonable to hold (although it is unnecessary to reach the point) that the reference to "possession" implicitly authorized the officers to search defendants' persons.

In any event, defendants had no reasonable expectation of privacy as to the presence of foreign matter on their hands independent of the expectation of the privacy of their premises, which had been legitimately invaded by the police. The grease may be compared to a physical characteristic, such as a fingerprint or one's voice, which is "constantly exposed to the public." *United States v. Dionisio*, 410 U.S. 1, 14 (1973). The Fourth Amendment provides no protection for what "a person knowingly exposes to the public." *Katz v. United States, supra* at 351. It is true that the grease could not be detected with the naked eye, but then, neither may a fingerprint be examined until there has been an application of ink. Furthermore, the examination was both limited and controlled, affording no opportunity to learn any information other than that specifically sought: Have the person's hands been in contact with the treated contraband? In this respect, the examination was more circumscribed than any eavesdropping, electronic surveillance, long-distance viewing with binoculars, or even the use of a flashlight. Also, it involved no personal indignities or physical discomfort, and was neither annoying, frightening, or humiliating. *Terry v. Ohio*, 392 U.S. 1, 25 (1968).

In these circumstances the use of the ultraviolet light to examine defendants' hands did not amount to a search. It may well be that in other circumstances an examination by ultraviolet light would amount to a search.* Each case turns upon its own facts. *Cf. Commonwealth v. Soychak, supra.*

In holding that the hashish found on the premises could not be used as evidence against defendant DeWitt, the hearing judge stated: "The package was mailed to J. Sellman at J. Sellman's address. The search warrant was for the home of J. Sellman only. There was no evidence that Robert DeWitt lived with J. Sellman. The hash was found in the home of J. Sellman under the floorboards in a second floor bedroom. Mere presence in the Sellman home is insufficient to make any of the evidence discovered legally relevant to him."

This conclusion was premature and beyond the scope of the proceeding before the hearing judge. The issue on a motion to suppress is whether the evidence has been constitutionally seized, not whether it will be admissible at trial. Pa. R. Crim. P. 323 (a), Reporter's Comment. At trial the Commonwealth may offer evidence that defendant DeWitt was not merely present in the Sellman home but was an active participant in the apparent scheme to smuggle the hashish from Morocco. (Even on the motion to suppress the Commonwealth showed that he had handled the hashish.) If the Commonwealth fails to offer such evidence, a demurrer will be sustained.

The order of the court below is reversed.

---

* It should be noted that at least two courts have considered the question presented here and have held that the use of ultraviolet light to determine whether a person has been in contact with contraband does not constitute a search. *United States v. Richardson*, 388 F. 2d 842 (6th Cir. 1968) ; *United States v. Millen*, 338 F. Supp. 747 (E.D. Wis. 1972). Neither court, however, offered reasons for its conclusion.