Commonwealth *v.* Maione, Appellant.

Argued November 15, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent.)

Before SWEET, P. J., without a jury.

*Sanford S. Finder,* for appellant.

*Fred J. Sentner,* Assistant District Attorney, with him *Roger J. Ecker,* Assistant District Attorney, and *Jess D. Costa,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., April 3, 1974:

Appellant contends that evidence obtained by an illegal seizure and search of his automobile was used to convict him of failure to stop at the scene of an accident and reveal his identity, in violation of The Vehicle Code, Act of April 29, 1959, P. L. 58, §1027(a), (b), 75 P.S. §1027(a), (b).

The testimony produced by the Commonwealth at the hearing on appellant's motion to suppress may be summarized as follows. At approximately 12:35 a.m. on January 16, 1970, Lt. Lawrence Celaschi of the Charleroi Police Department while on routine patrol witnessed a hit-and-run accident. The car involved knocked down a pedestrian and sped past the officer "at a high rate of speed." The officer was able to tell, however, that it was a "1963 Chevy, dark color;" at the time he had a 1964 Chevrolet very much like it. He radioed for an ambulance and started in pursuit but "got stuck in the ice and snow" and radioed for "the other police car to come up." The ambulance and other police car arrived at about the same time, and once the victim was enroute to the hospital, Celaschi and his fellow officer went in search of the hit-and-run car. At approximately 1 a.m., or twenty-five minutes after the accident, they spotted a "1963 Chevy Coupe, color dark gray," standing in the parking lot of The Maples, a restaurant between a half and three quarters

of a mile from the scene of the accident. Celaschi got out of the police car and inspected the Chevrolet's exterior. Its right front fender had been slightly damaged and "the headlight had a slight crack." By relaying the registration over the radio, Celaschi learned that the owner was a Patsy Maione. He went into The Maples and asked for Patsy Maione. The bartender pointed out appellant. When Celaschi asked how long appellant had been there, the bartender replied that it had been approximately twenty-five or thirty minutes. Celaschi approached appellant, told him about the accident, and asked if he would mind driving to the police station for questioning. Appellant agreed and accompanied by Celaschi drove his car to the station and parked it in the borough garage. Celaschi and appellant talked for about fifteen minutes but appellant denied any knowledge of the accident. Celaschi then attempted to inspect appellant's car but insufficient lighting in the garage and "other calls" prevented him from conducting a thorough inspection. In the meantime appellant had fallen asleep. When he awakened at approximately 2:45 a.m., Celaschi permitted him to leave but told him that his car was being impounded.

At approximately 6:15 a.m. Lt. William R. Verno reported for duty and was instructed by Celaschi to inspect appellant's car, especially the right-hand side, for evidence that might link it to the hit-and-run accident. Verno called a magistrate but was told he did not need a search warrant. Using a magnifying glass, Verno found some fibers on the jagged edge of the damaged right front fender, near the headlight; he could not see the fibers with his naked eye. After photographing the fender, he removed the jagged fender edge and took it, along with some paint scrappings from the fender and the coat and trousers that the accident victim had been wearing, to the Pennsylvania State Police Laboratory in Greensburg. In all the inspection

of the car took from 7 a.m. until approximately 9 or 9:30 a.m.

On May 14, 1970, Verno received a report from the laboratory that the fibers found on the jagged fender edge matched fibers from the victim's trousers. On the basis of this report, on May 23, 1970, appellant was arrested.

Appellant's motion to suppress the jagged fender edge and the laboratory report was denied, as were his post-trial motions for a new trial and in arrest of judgment, which raised the same issue as had been raised by the motion to suppress.

## I.

As a general rule the Fourth Amendment requires as a prerequisite to search the issuance of a search warrant by a magistrate who has made an independent judgment as to probable cause. However, "[given] exigent circumstances . . . the judgment of the police as to probable cause [may] serve as a sufficient authorization for a search." *Chambers v. Maroney*, 399 U.S. 42, 51 (1970). *See, e.g., Schmerber v. California*, 384 U.S. 757 (1966) (warrantless testing of rapidly deteriorating blood alcohol level).

In *Carroll v. United States*, 267 U.S. 132 (1925), the existence of exigent circumstances was relied upon to justify the warrantless search of an automobile stopped on the highway by federal officers who had probable cause to believe that it contained contraband liquor. The Supreme Court concluded that "due to the mobility of the automobile and the occupants having been alerted by the police, an exigency existed which made obtaining a warrant impractical. . . . If the officers had taken time to obtain the warrant, . . . the automobile [could have been driven] out of the jurisdiction." Comment, 47 Notre Dame Lawyer 668, 669

(1972). The rule as it has evolved from *Carroll* is that exigent circumstances justifying warrantless search of an automobile will be found where the probable cause arises (1) in an unforeseen way and shortly before the opportunity for search, (2) at a time when the automobile is mobile so that the opportunity for search is fleeting. *Chambers v. Maroney, supra* at 50-51.

Given the existence of such exigent circumstances, the police may either make an immediate search on the scene or they may seize and take the automobile to a police station and search it there. Although it has been argued that in the latter case the police should be required to get a warrant, this argument has been rejected. *Chambers v. Maroney, supra*. "The rationale of Chambers is that *given* a justified initial intrusion [*i.e.*, an intrusion justified under *Carroll v. United States, supra*], there is little difference between a search on the open highway and a later search at the station." *Coolidge v. New Hampshire,* 403 U.S. 443, 463 n.20 (1971).*

## II.

There is no distinction of substance between the present case and *Chambers v. Maroney, supra,* and as the warrantless search in *Chambers* was upheld, so

---

* Among the cases permitting delayed searches under Chambers are: *United States v. Chalk,* 441 F. 2d 1277 (4th Cir.), *cert. denied,* 404 U.S. 943 (1971) ; *United States v. Boyd,* 436 F. 2d 1203 (5th Cir. 1971) ; *United States v. Castaldi,* 453 F. 2d 506 (7th Cir. 1971) ; *Smith v. United States,* 431 F. 2d 1 (8th Cir. 1970) ; *Commonwealth v. Rand,* 73 AS 729, 296 N.E. 2d 200 (Mass. S. Ct. 1973) ; *State v. Allen,* 282 N.C. 503, 194 S.E. 2d 9 (1973). *Cf. Commonwealth v. Smith,* 452 Pa. 1, 304 A. 2d 456 (1973) (where the Court was unable to reach a majority opinion). *See also* Note, Warrantless Searches and Seizures of Automobiles, 87 Harv. L. Rev. 835, 837-845 (1974) (brief review and critique).

must the warrantless search here be upheld. In *Chambers,* as here, both of the required elements of the "exigent circumstances" rule were shown.

With respect to the first requirement, of unforeseen probable cause:

In *Chambers* the probable cause to search was based on statements by the Gulf service station attendant who had been robbed and by two teenagers. The attendant said one robber wore a green sweater and another a trench coat. The teenagers said they had seen a blue compact station wagon circle the block and then speed away with four men in it, one wearing a green sweater. "Within an hour, a light blue compact station wagon answering the description and carrying four men was stopped by the police about two miles from the Gulf station. Petitioner was one of the men in the station wagon. He was wearing a green sweater and there was a trench coat in the car." *Chambers v. Maroney, supra* at 44. In these circumstances, the police had "ample" probable cause, *id.* at 46, which had arisen in the sort of "unforeseeable" circumstances, *id.* at 51, required by the exigent circumstances rule.

In the present case, Lt. Celaschi saw the accident. He was able to identify the hit-and-run car as a 1963 dark colored Chevrolet. Within approximately twenty-five minutes he found just such a Chevrolet in a restaurant parking lot, a half to three-quarters of a mile from the scene of the accident. The car was slightly damaged on its right front, which was where the officer had seen the hit-and-run car collide with the victim. Finally, the officer was told by the bartender that the owner of the car had been in the bar for approximately twenty-five or thirty minutes. On these facts the probable cause was as "ample" and arose in circumstances as "unforeseeable" as in *Chambers.* And see *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 221 (1968).

With respect to the second requirement, of fleeting opportunity to search: In both *Chambers* and the present case the suspect vehicle might have been driven from the jurisdiction, and search thus precluded, had the police delayed to obtain a warrant.

*Chambers* and the present case are also the same in that in each, instead of making an immediate search on the scene, the police took the suspect vehicle to the police station and searched it there. As has been noted, given the existence of exigent circumstances on the scene, this was a choice available to the police. In *Chambers,* after arresting the occupants the police drove the suspect vehicle to the police station where it was searched "once to no avail. The searching officers then entered the station, interrogated [Chambers] and the car's owner, and returned later for another search— this one successful." *Chambers v. Maroney, supra* at 63, n.8 (HARLAN, J., dissenting). In the present case, the suspect vehicle was in fact examined at once, on the restaurant parking lot where it was found. While not conclusive, the examination corroborated the officer's identification of the vehicle in that it revealed damage to the right front, where the pedestrian had been hit. This may be compared to the police in *Chambers* seeing a trench coat in the suspect vehicle. Also as in *Chambers,* the first examination at the police station was to no avail, but the second, made when it was daylight and the police had the time to go over the fender with a magnifying glass, was successful.*

---

* The judge who heard appellant's motion to suppress stated in his opinion that he "doubt[ed] that the actions of the police in examining the fender of the automobile with a magnifying glass, can be termed a 'search' of the vehicle." This conclusion served as an alternate basis for his refusal to suppress. The parties have addressed themselves to this finding. However, it is irrelevant whether the examination of the outside of appellant's car with a magnifying glass constituted a "search"; it is the constitutionality

## III.

Appellant relies principally on three cases. Analysis will show, however, that none of these disturbs the conclusion that *Chambers* is controlling.

In *Coolidge v. New Hampshire, supra* at 460-61, a plurality of four members of the court found that no exigent circumstances existed where:

". . . the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for an illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly "fleeting."

. . . .

"When the police arrived at the Coolidge house to arrest him [pursuant to an arrest warrant], two officers were sent to guard the back door while the main party approached from the front. Coolidge was arrested inside the house, . . . There was no way in which he could conceivably have gained access to the automobile after the police arrived on his property. When Coolidge had been taken away, the police informed Mrs. Coolidge, the only other adult occupant of the house, that she and her baby had to spend the night elsewhere

of the seizure of the car that is crucial. If the seizure was not constitutional, the police had no right to be in a position to examine the car's exterior, and a finding that the examination was not a search would not affect the result that the evidence found must be suppressed. *See Commonwealth v. DeWitt*, 226 Pa. Superior Ct. 372, 314 A. 2d 27 (1973) (where officers had right to be on premises because of warrant, passing of ultraviolet light over hands of occupants did not constitute a search).

and that she could not use either of the Coolidge cars. Two police officers then drove her in a police car to the house of a relative in another town, . . . The Coolidge premises were guarded throughout the night by two policemen."

Thus it will be observed that in contrast to *Chambers* and the present case, in *Coolidge* the probable cause did not arise in unforeseeable circumstances, and at a time when the opportunity to search the suspect vehicle was fleeting; the police, without jeopardizing the search, had ample opportunity to obtain a warrant after they knew of probable cause. Thus there were no "exigent circumstances," and in holding that a warrant should have been obtained, the court in *Coolidge* was applying the same rule that leads in the present case to the conclusion that no warrant was needed.*

The same observation may be made with respect to *Commonwealth v. Heard*, 451 Pa. 125, 301 A. 2d 870 (1973), which is the second of the cases on which appellant principally relies. There the defendant was arrested at his home for purse snatching. The arrest was pursuant to a warrant and he was immediately taken to a police station. His home and automobile

---

\* Another aspect of *Coolidge* concerned the fact that the items involved were "neither stolen, nor contraband nor dangerous." *Coolidge v. New Hampshire, supra* at 471. The same is so in the present case. This fact, however, is of no consequence. In *Warden v. Hayden*, 387 U.S. 294, 309 (1967), the Court held that "there is no viable reason to distinguish intrusions to secure 'mere evidence' from intrusions to secure fruits, instrumentalities or contraband." There is no reason to preserve the thus abandoned mere evidence distinction in the area of warrantless searches of automobiles. The rationale that supports warrantless searches of automobiles does not turn on the nature of the item in the automobile but on the automobile's mobility, which makes it easy for the item for which there is probable cause to search to be carried out of the jurisdiction, whatever the item's nature. In any event, if the distinction lives, appellant's automobile could be classified as "the instrumentality" used in the hit-and-run accident.

were then searched without a warrant. The police were aware of the role the defendant's car had played in the crimes; it had been used by the thief to make his getaway, and the license number, which the victim had taken down, had been used to trace its ownership to the defendant. Given the fact that probable cause therefore arose well before the search and at a time when there was plenty of opportunity to obtain a warrant, the court held the warrantless search invalid.

In *Commonwealth v. Linde,* 448 Pa. 230, 293 A. 2d 62 (1972), the third of appellant's cases, the decisive fact was that the vehicle's mobility was not a factor that made it impractical for the authorities to obtain a warrant after probable cause arose. The defendant's car was parked about 550 yards from the home of his girlfriend, whom he was accused of murdering. "The record disclose[d] that from the moment the vehicle was located until the search ensued, it was kept under constant police guard. At the time of the search, it was locked, unoccupied and the police were in possession of the keys. Linde himself was in the hospital undergoing emergency surgery [for a self-inflicted wound], and there was no danger he would move it . Thus, no good reason existed why a search warrant could not be obtained." *Id.* at 233, 293 A. 2d at 64. In the present case, in contrast, there is no indication that the Charleroi Police Department had men available to guard appellant's car until a warrant could be obtained; indeed, the record suggests otherwise. The police might have taken appellant's keys, leaving the car on the restaurant parking lot, locked but unguarded. However, it was reasonable for them to believe that this would not have been an adequate means of assuring that the car would still be available after a warrant had been obtained; appellant or someone else might have had another set of keys and have driven the car away, or they might have broken into the car and started it without

keys. It cannot be said, as could be said in *Linde,* that "there was no danger" appellant would move the car. The judgment of sentence is affirmed.