Commonwealth, Appellant, *v.* Quarles.

Argued June 12, 1973. Before Wright, P. J., Watkins, Jacobs, Hoffman, Spaulding, Cercone, and Spaeth, JJ.

*Stephen B. Harris,* First Assistant District Attorney, with him *Kenneth G. Biehn,* District Attorney, for Commonwealth, appellant.

*Peter N. Harrison,* for appellee.

OPINION BY SPAETH, J., June 21, 1974:

This is an appeal by the Commonwealth from an order suppressing the results of a breathalyzer test.

The facts may be summarized as follows: On July 24, 1972, at about 9:30 a.m., a Doylestown Borough police officer was dispatched by police radio to the scene of a two car accident. When he arrived he asked the persons standing around the cars who had been driving. Appellee identified himself as one of the drivers. Appellee's breath smelled of alcohol; his speech was slightly slurred; he was unsteady on his feet; and he had difficulty in producing his driver's license and owner's card. It also appeared to the officer that appellee's car had gone some 134 feet after the impact before coming to rest against a telephone pole. From these observations the officer concluded that appellee had been driving under the influence of alcohol, in violation of The Vehicle Code, Act of April 29, 1959, P. L. 58, §1037, 75 P.S. §1037. Accordingly, the officer arrested appellee and gave him the warnings required by *Miranda v. Arizona,* 384 U.S. 436 (1966). When appellee agreed to submit to a chemical test of his breath, he was taken to a state police barracks, twenty-two miles from the scene of the accident, where a breathalyzer test was administered. On July 31, a summons was issued, but at the preliminary hearing held on August 30 appellee was

discharged. The next day an arrest warrant was issued. On October 3 appellee surrendered to the issuing authority and waived a preliminary hearing. On January 4, 1973, he was indicted for operating a motor vehicle while under the influence of intoxicating liquor. On March 12 his motion to suppress the results of the breathalyzer test was heard and granted, the hearing judge ruling from the bench as follows:

"1. The defendant was arrested by a police officer for a misdemeanor without a warrant, this misdemeanor not being committed in the presence of the arresting officer.

"2. An arrest for a misdemeanor not committed in the presence of an officer is an unlawful arrest.

"3. The Breathalyzer test was requested and submitted to incidental to said unlawful arrest.

"Therefore, we suppress the results of the Breathalyzer test and all other evidence secured as a result of the illegal arrest.

## The Present Case Law

There can be no doubt that the hearing judge's ruling was correct on the basis of the present case law.

*Schmerber v. California*, 384 U.S. 757 (1966), is the seminal case. Schmerber was convicted of driving under the influence of intoxicating liquor. He had been arrested without a warrant at a hospital while receiving treatment for injuries suffered in an automobile accident. Under California law the warrantless arrest was legal. At the direction of a police officer, a blood sample was taken and tested for alcoholic content. Schmerber was conscious at the time. On appeal to the Supreme Court he contended that the taking of his blood constituted an illegal search and seizure because no warrant had been obtained beforehand. The Court disagreed. It first noted that Schmerber was under le-

gal arrest at the time his blood was taken. Thus the initial seizure of Schmerber was justified as a lawful arrest. The Court went on to conclude that the facts that established probable cause for the arrest also suggested with some certainty that the desired proof of intoxication would be obtained. The Court explained the need for such certainty as follows: "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." *Id.* at 770. As for the failure of the officer to obtain a warrant, the Court found that since the percentage of alcohol in the blood quickly diminishes, he was confronted by an emergency in which there was no time to obtain one. The Court was satisfied that "the test chosen to measure [Schmerber's] blood-alcohol level was a reasonable one" and that "the test was performed in a reasonable manner."[1] *Id.* at 771. The Court therefore concluded that Schmerber's blood was lawfully secured in light of the exigent circumstances in a search incident to a lawful arrest, but it cautioned: "It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an in-

----

[1] Said the Court: "Finally, the record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain." *Id.* at 771-72.

dividual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772.

Relying on *Schmerber,* the Pennsylvania Supreme Court in *Commonwealth v. Murray,* 441 Pa. 22, 271 A. 2d 500 (1970), held that the results of a blood test taken under similar circumstances should have been suppressed. The test had been administered without the defendant's consent while he was at a hospital undergoing treatment for injuries received in an automobile accident. The court recognized that the taking of a blood sample was a search and seizure that under certain circumstances may properly be conducted as incident to a lawful arrest. Since the defendant was not under arrest when the blood sample was taken, and was not placed under arrest until thirteen days later, the court concluded that the administration of the blood test had been improper.

*Commonwealth v. Reeves,* 223 Pa. Superior Ct. 51, 297 A. 2d 142 (1972), presented a similar set of facts. The defendant there was involved in a two car accident in which another person was killed. After the defendant had been taken to the hospital, a state trooper arrived on the scene. As a result of his investigation, he went to the hospital, where, without a warrant, he arrested the defendant. Later, the defendant was charged with operating a motor vehicle while under the influence of intoxicating liquor and involuntary manslaughter—both misdemeanors. The lower court suppressed the results of a blood test, and on the Commonwealth's appeal this court affirmed. "A police officer may only make a warrantless arrest for a misdemeanor 'where he has probable cause to believe that a misdemeanor *is being committed in his presence.'* Commonwealth v. Vas-

siljev, 218 Pa. Superior Ct. 215, 219-220, 275 A. 2d 852 (1971) (emphasis added)." *Id.* at 52-53, 271 A. 2d at 143.[2] Since the defendant did not commit a misdemeanor in the officer's presence, he was illegally arrested and the results of the blood test were properly suppressed as administered incident to an illegal arrest. *See also Commonwealth v. Jacoby,* 226 Pa. Superior Ct. 19, 311 A. 2d 666 (1973); *Commonwealth v. Brown,* 225 Pa. Superior Ct. 289, 302 A. 2d 475 (1973).

Appellee's case falls within the holding of *Reeves.*

## The Implied Consent Law

In its brief, "[t]he Commonwealth concedes . . . that the arrest of appellee was illegal, as the offense, a misdemeanor, was not committed in the officer's presence and therefore the officer was required to procure a warrant prior to the arrest and thus a warrantless search

---

[2] As noted in my concurring opinion in *Commonwealth v. Wilson,* 225 Pa. Superior Ct. 513, 522-23, 312 A. 2d 430, 434 (1973): "This rule leaves much to be desired, for it may require an officer to choose between making an illegal arrest and leaving a drunk driver on the road where he is a menace both to himself and others. A possible solution to this dilemma may be found in §5505 of the New Crimes Code, 18 Pa.S. §101 *et seq.* (1973), which reads as follows: 'A person is guilty of a summary offense if he appears in any public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or annoy persons in his vicinity.' " According to Pa. R. Crim. P. 51A(6), a criminal proceeding for violation of §5505 may be commenced by a uniformed officer by an arrest without a warrant since the offense is one that "endangers property and the safety" of the driver and other persons present on the highway. "It is not suggested that §5505 be used as a device to herd citizens to police stations in order to conduct inquiries that extend beyond their state of intoxication, but no reason appears why it should not apply to the drunk driver who has been in an accident or has committed the offense of drunken driving in the presence of witnesses on whom the officer has reason to rely." *Commonwealth v. Wilson, supra.*

which relied on the arrest for its validity is defective." The Commonwealth goes on to argue "that the breath test was [nonetheless] justified as a consensual search and [its results were] therefore admissible in evidence against the appellee whether or not the arrest was valid."

In advancing this argument the Commonwealth relies on the "implied consent law," The Vehicle Code, *supra* §624.1, added Act of July 28, 1961, P. L. 918, §1, as amended, July 31, 1968, P.L. 758, No. 237, §1, Act of December 22, 1969, P. L. 392, §1, 75 P.S. 624.1, which reads in pertinent parts as follows:

"(a) Any person who operates a motor vehicle . . . in this Commonwealth, shall be deemed to have given his consent to a chemical test of his breath, for the purpose of determining the alcoholic content of his blood: Provided, That the test is administered by qualified personnel and with equipment approved by the secretary at the direction of a police officer having reasonable grounds to believe the person to have been driving while under the influence of intoxicating liquor. Qualified personnel means a physician or a police officer who has received training in the use of such equipment in a training program approved by the secretary. If any person is placed under arrest and charged with the operation of a motor vehicle . . . while under the influence of intoxicating liquor and is thereafter requested to submit to a chemical test and refuses to do so, the test shall not be given but the secretary may suspend his license or permit to operate a motor vehicle . . . with or without a hearing . . . .

"(b) In any summary proceeding or criminal proceeding in which the defendant is charged with driving a motor vehicle . . . while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood, as shown by a chemical analysis of his breath, his blood, or his urine, which analysis was conducted

with equipment approved by the secretary and operated by qualified personnel, shall be admissible in evidence." According to the Commonwealth, "[t]he underlying rationale of this implied consent Statute is that a person has only the privilege which is granted to it [*sic*; him] by the State to operate a motor vehicle upon the public highways. He does not have an absolute right. The Pennsylvania courts have consistently held that the motor vehicle operator's license is a mere privilege, Commonwealth v. Funk, 323 Pa. 390 (1936), which allows its holder a limited right to use the public highways. The Commonwealth, acting through the General Assembly, may direct the conditions under which the privilege may be exercised. Commonwealth v. Halteman, 192 Pa. Superior Ct. 379 (1960).

"The Legislature has determined that because of the danger presented by an operator who is under the influence of alcohol, each driver impliedly consents to a 'chemical test of his breath' when he applies for operating privileges . . . . Therefore, operator having been deemed to have consented to the test of his breath, the results of that test are admissible under the exception to the search warrant rule for consent searches.

. . . .

"A careful reading of Section (a) of Section 624.1 supports the conclusion that the Statute was meant to provide an implied consent to the breath test and not be limited to providing for breath tests incidental to a lawful arrest. The first sentence of the Statute does not refer to an arrest but only whether the officer has reasonable grounds for the conclusion. The third sentence of the Act providing for automatic suspension for refusal to take the breath test, by way of contrast, does depend on a lawful arrest . . . . The Legislature differentiated between the need to suspend operating privileges when an operator refuses to take the test. The court should follow this differentiation for rarely

if ever would a chemical test of breath be incidental to a lawful arrest as it would not be incidental in place and time. *See, e.g.,* Commonwealth v. Cockfield, 411 Pa. 71 (1963)."

For reasons to be discussed, we accept the Commonwealth's argument that the implied consent law should be construed as not requiring a legal arrest before a breathalyzer test may be requested, but not its argument that the driver's implied consent provides a constitutional basis for the seizure of the driver's person and the subsequent testing. It will therefore be necessary to consider whether there is some other constitutional basis. We have decided that there is.

### The Necessity for a Legal Arrest a Matter of Statutory Construction

According to the proviso in the first sentence of subsection (a) of the implied consent law, to request that a test be taken the officer must have "reasonable grounds to believe the person [to be tested] to have been driving while under the influence of intoxicating liquors." There is no definition of "reasonable grounds." According to the third sentence of subsection (a), a person's license may be suspended for refusal to take a test only if, at the time he was requested to take the test, he had been "placed under arrest and charged with the operation of a motor vehicle . . . while under the influence of intoxicating liquor." This specific reference to arrest suggests three possible constructions that can be given to the "reasonable grounds" language:

(1) "Reasonable grounds" for an officer to request a test exist only when there has been a legal warrantless arrest for drunken driving.

(2) The "reasonable grounds" language sets forth a new standard for arrest for drunken driving.

(3) The "reasonable grounds" language authorizes a request for a test on a basis that does not require an arrest.

The second alternative can be rejected at the outset. There is no indication that the General Assembly meant to authorize arrests on less than the standard discussed in *Reeves*. If it did, it should have said so. 1 Pa. S. §1928(b) (Supp. 1974) (mandating strict construction of penal provisions).

It should be noted that the Commonwealth Court seems to have reached a different construction of the law. In *Commonwealth v. Miles,* 8 Pa. Commonwealth Ct. 544, 304 A. 2d 704 (1973), the driver's license had been suspended because of his refusal to take a breathalyzer test. In deciding whether to uphold the suspension the court was obliged to construe the requirement that the driver be "placed under arrest" at the time he is requested to take the test. The court held that this requirement is met by any action that subjects a driver to the "actual control and will of the person making the arrest," *id.* at 549, 304 A. 2d at 707, provided the arresting officer has reasonable grounds for his action. Thus, said the court, a legal arrest is not required:

"We are here dealing with the authority to request a person to submit to a chemical test and not, as was the Superior Court in Commonwealth v. Reeves, 223 Pa. Superior Ct. 51, 297 A. 2d 142 (1972), with the admission into evidence of the result of such a test. See Commonwealth v. Brown [225] Pa. Superior Ct. [289], 302 A. 2d 475 (1973). The Legislature, in Section 624.1(a), stated that the breathalyzer test is to be administered at the direction of a police officer 'having reasonable grounds to believe the person to have been driving while under the influence of intoxicating liquor.' This is not the same standard as applied in Commonwealth v. Reeves, *supra,* to determine whether a police officer may make a warrantless arrest for a misdemeanor.

". . . It is not a question of the lawfulness of the arrest or the admissibility into evidence of the results of the test, but rather the refusal to submit to the test at a time when Section 624.1(a) is applicable. It is a factual determination not a legal determination." *Id.* at 551, 304 A. 2d at 708.

We are not persuaded by this reasoning.[3] We do not see how we can avoid making "a legal determination," especially where our concern is safeguarding the rights of defendants. The Commonwealth Court seems to have been cognizant that our concern differs from its own.

The first alternative—that "reasonable grounds" exist only where there has been a legal warrantless arrest—is also unacceptable. The statute only requires that the officer have "reasonable grounds to believe the person to have been driving while under the influence of intoxicating liquor." There is no reference to the requirements that must be met for the officer to effect a legal arrest. There is no reason to construe "reasonable grounds" as limited to situations where a legal arrest has been made, for under *Reeves* that would mean the officer must have seen the person driving. "Reason-

---

[3] This conclusion is not inconsistent with our holding in *Commonwealth v. Wolpert*, 224 Pa. Superior Ct. 361, 308 A. 2d 120 (1973). In *Wolpert* this court considered whether a person not under arrest for drunken driving has the right to refuse to submit to a test of his breath or blood. We concluded that he does. "It is apparent that the legislature intended the statute to apply to all cases where drunken driving is suspected," *id.* at 369, 308 A. 2d 125, and although not legally arrested, a person who is stopped and requested to take a test is no longer free to leave and his confinement may literally be termed an "arrest." Our holding in *Wolpert* is similar to that of *Commonwealth v. Miles, supra.* In reaching it, however, we were attempting to protect defendants from an illogical construction of the law, which while giving persons under legal arrest a right of refusal would have denied that right to persons not under arrest or under illegal arrest. *Id.* at 370, 308 A. 2d at 125. Moreover we specifically declined to consider the effect of the implied consent law on the *Murray* line of cases. *Id.* at 371 n.7, 308 A. 2d at 126 n.7.

able grounds" may exist where, even though the officer did not see the person driving, he has knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man in the belief that the person seized was driving and was doing so under the influence of intoxicating liquor. *Commonwealth v. Hicks*, 434 Pa. 153, 158, 253 A. 2d 276, 279 (1969) (stating the standard for arrests in cases involving felonies).

The third alternative—that the "reasonable grounds" language authorizes a request for a test on a basis that does not require an arrest—is therefore the best, for it is consistent with the fact that in requiring "reasonable grounds" the General Assembly makes no reference to arrest. Perhaps, if a legal arrest were required as a prerequisite to the suspension of a driver's license, it would be inconsistent and unfair to hold that a legal arrest was not required before the test results could be admitted in a criminal prosecution. Any such inconsistency is avoided by the holding in *Commonwealth v. Miles, supra.* Thus, if we adopt the third alternative, no greater safeguards are provided where a driver faces loss of his license than where he faces a criminal conviction.

## Constitutional Considerations

The decision that the implied consent law authorizes the request and administration of a test on "reasonable grounds" unaccompanied by a legal arrest presents the question of whether such an authorization is constitutionally permissible.

As indicated by *Schmerber v. California, supra,* "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents, see

Davis v. Mississippi, 394 U.S. 721, and the subsequent search for and seizure of the evidence." *United States v. Dionisio,* 410 U.S. 1, 8 (1973). Thus, where a person is pursuant to the implied consent law held or transported so that either his blood or breath may be tested, and the test is administered, the requirements of the Fourth Amendment must be satisfied as to both the seizure and confinement of the person and the subsequent testing and seizure of evidence.[4]

"As a general rule the Fourth Amendment requires as a prerequisite to [a search and seizure] the issuance of a search warrant by a magistrate who has made an independent judgment as to probable cause." *Commonwealth v. Maione,* 227 Pa. Superior Ct. 239, 243, 324 A. 2d 556, 557 (1974). The requirement of a warrant is dispensed with where a search and seizure are conducted pursuant to valid consent, or in circumstances falling within one of the recognized exceptions to the warrant requirement. *See United States v. Mapp,* 476 F. 2d 67, 76 (2d Cir. 1973) (enumerating recognized exceptions).

### Consent—Actual or Implied

It is possible that a driver may actually consent to a seizure of his person and the administration of a test of his breath or blood. Actual consent may then provide a constitutional basis for the seizure and test. Such consent must appear from "all the surrounding circumstances" to have been voluntary, *i.e.,* not "coerced, by

---

[4] *Schmerber v. California, supra,* and *Commonwealth v. Murray, supra,* make it clear that the administration of a blood test constitutes a search and seizure. The Commonwealth treats the administration of a breathalyzer test as a search and seizure. This concession is appropriate. The difference between the two tests is insignificant. There is a seizure in both (of blood or air), and the material seized comes from within the suspect's body. Cf. *Commonwealth v. DeWitt,* 226 Pa. Superior Ct. 372, 314 A. 2d 27 (1973) (no search and seizure where light is applied to skin).

explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228 (1973).

There is no argument in the present case that appellant actually consented to being seized and having his breath tested. Instead, the Commonwealth argues that appellant, like every other driver licensed by the Commonwealth, impliedly consented. The Commonwealth's argument may be summarized as follows: The ability to operate a motor vehicle is a privilege, not a right. Thus the Commonwealth is not obligated to permit one to drive. Moreover, the Commonwealth can put conditions on the exercise of the privilege when extended. With the implied consent law the Commonwealth has in effect conditioned the granting (and also the retention) of the privilege to drive on the recipient's surrender of his right to be free from searches and seizures that could not otherwise be constitutionally conducted and may yield evidence that can be used against him in a criminal prosecution.

This argument is not persuasive and does not supply a constitutional justification for the implied consent law.

Whether the ability to operate a motor vehicle is deemed a right or privilege,[5] there are constitutional restraints that limit the exercise of state power in regard to it. *Bell v. Burson,* 402 U.S. 535 (1971);[6] Van

---

[5] It is hard to accept the continued characterization of a license to drive as a privilege. "No one will deny that we have reached a time in our modern way of life when the motor vehicle has clearly become a necessity to many people. The very livelihood of many, such as chauffeurs, truckers, traveling salesmen, men who work in skilled or unskilled labor, depends upon the operation of a motor vehicle. Their drivers' licenses are just as valuable as a license to engage in an occupation or profession." *State v. Moseng,* 254 Minn. 263, 271, 95 N.W. 2d 6, 12-13 (1959).

[6] In *Bell v. Burson, supra,* the Supreme Court held that licenses could not be suspended without the procedural safeguards guaran-

Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968). There can be no doubt of that where the condition on which the grant and continued enjoyment of the privilege is based infringes the exercise of a constitutional right. Van Alstyne, *supra* at 1445-49 (discussing the doctrine of unconstitutional conditions).·

teed by the due process clause. It reasoned: "If the statute barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment. Ex parte Poresky, 290 U.S. 30 (1933); Continental Baking Co. v. Woodring, 286 U.S. 352 (1932); Hess v. Pawloski, 274 U.S. 352 (1927). It does not follow, however, that the amendment also permits the Georgia statutory scheme where not all motorists, but rather only motorists involved in accidents, are required to post security under penalty of loss of the licenses. See Shapiro v. Thompson, 394 U.S. 618 (1969); Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583 (1926). Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. Sniadach v. Family Finance Corp., 395 U.S. 337 (1969); Goldberg v. Kelly, 397 U.S. 254 (1970). This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.' Sherbert v. Verner, 374 U.S. 398 (1963) (disqualification for unemployment compensation); Slochower v. Board of Education, 350 U.S. 551 (1956) (discharge from public employment); Speiser v. Randall, 357 U.S. 513 (1958) (denial of a tax exemption); Goldberg v. Kelly, *supra* (withdrawal of welfare benefits). See also Londoner v. Denver, 210 U.S. 373, 385-386 (1908); Goldsmith v. Board of Tax Appeals, 270 U.S. 117 (1926); Opp Cotton Mills v. Administrator, 312 U.S. 126 (1941)." *Id.* at 539.

7 It should be noted at this point that the Fourth Amendment search and seizure rights are not the only constitutional rights involved here. "Although the right to travel is not absolute, and its scope and limitations remain uncertain, it is firmly settled that freedom to travel at home and abroad without unreasonable govern-

As indicated in Note, Unconstitutional Conditions, 73 Harv. L. Rev. 1595, 1596-97:

"The power of government to regulate private activities often encompasses the power to prohibit absolutely. Because of this power, it has been frequently asserted that any activity carried on in the areas subject to government regulatory authority represents an exercise of a privilege granted by the sovereign. Consequently, an attempt has been made to transform the power to prohibit into a power to withhold or grant benefits contingent upon the surrender of rights.

"Regulation is valid only when employed to protect a social interest endangered by activity in the regulated area and when the means adopted are in fact suited to the protection of that interest. An absolute prohibition of participation in an activity and permission to engage in it conditioned upon the waiver of certain rights are simply alternative techniques of regulation which, like any others, must satisfy the test of suitability to the achievement of objectives which justify the exercise of governmental regulatory power. Clearly, then, revocation of permission to engage in an activity, based on subsequent assertion of initially waived rights, is improper unless exercise of those rights, in the context concerned, adversely affects a recognized public interest." [Footnotes omitted.] *See also* Van Alstyne, *supra* at 1462 (urging resort to substantive due process to protect privileges against unreasonable regulation, *i.e.*, regulation lacking "a sufficient connection with an adequately compelling public interest to warrant subordi-

mental restriction is a fundamental constitutional right of every American citizen." *United States v. Davis*, 482 F. 2d 893, 912 (9th Cir. 1973). *See also Shapiro v. Thompson*, 394 U.S. 618 (1969). Moreover, Article I, Section 8, of the Pennsylvania Constitution prohibits unreasonable searches and seizures. What is said here in reference to the Fourth Amendment applies equally to this provision.

nating the individual interest under the circumstances").

In evaluating the condition imposed by the implied consent law, we must first state exactly what competing interests are involved. The Commonwealth is seeking not only to identify drunken drivers who represent a menace on the highways, but also to procure evidence that can be used to prosecute them in criminal proceedings. (The additional goal of denying these drivers permission to use the roads is relevant not here but in suspension of license proceedings.) As for the driver, he has an interest in being free of unreasonable searches and seizures of his person that may yield evidence that can be introduced against him in a criminal prosecution.

On balance, the driver's interests outweigh those of the Commonwealth. The searches and seizures conducted under the implied consent law involve the person, not papers or effects. Intrusions that involve the person should be strictly limited and permissible only upon compliance with the strict standards of the Fourth Amendment. If we found implied consent here those standards would be totally irrelevant. A defendant in a criminal prosecution has much at stake—his reputation, his continued capacity to work, and most important, his freedom. The rights provided him by the Fourth Amendment are most important when the stakes are so high. Finally, it must be noted that the Commonwealth is not totally disabled from procuring evidence of intoxication by reliance on the traditional exceptions to the warrant requirements of the Fourth Amendment. *See, e.g., Commonwealth v. Murray, supra.* It is hard to find the Commonwealth's condition reasonably necessary when alternative means to procure the same evidence which are in accord with established doctrine are available.

## Seizures and Searches Based Solely on Probable Cause—*Cupp v. Murphy*

It having been decided that warrantless searches and seizures authorized by the implied consent law cannot be constitutionally justified on the basis of the driver's implied consent, the question becomes whether such searches and seizures fall within one of the recognized exceptions to the general rule that under the Fourth Amendment a warrant is required.

A warrantless search may be made incident to any legal arrest provided it is confined to the arrestee's person, *United States v. Robinson*, 414 U.S. 218 (1973), and to the area within which he might gain possession of a weapon or destructible evidence, *Chimel v. California*, 395 U.S. 752 (1969). Under *Schmerber v. California, supra*, a blood test may be administered as a search incident to a legal arrest. Since it has been concluded above that the implied consent law is to be construed as permitting tests where there has not been a legal arrest, reliance cannot be placed on *Chimel* and *Schmerber*. Recently, however, in *Cupp v. Murphy*, 412 U.S. 291 (1973), the Supreme Court has cited the rationale of these cases in the course of holding that in certain limited circumstances a suspect who has not been arrested may be seized, and his person searched for destructible evidence, without an arrest or search warrant.[8] It is therefore necessary to consider the ap-

---

[8] Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may stop a person if he observes specific instances of unusual and suspicious conduct on the part of the person or receives information from a reliable source that leads him reasonably to conclude that criminal activity is afoot, and he may frisk the person for weapons if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio, supra* at 27. *See Adams v. Williams*, 407 U.S. 143 (1972). *And see Commonwealth v. Hicks, supra* at 158, 253 A. 2d at 279.

plicability to the present case of this further exception to the general Fourth Amendment warrant requirement.

The facts of *Murphy* may be stated as follows: Murphy voluntarily went to a police station where he was questioned about the strangulation murder of his wife. Although there was probable cause,[9] he was not arrested then. In fact, he was not arrested until one month later. Shortly after his arrival at the police station the police noticed a dark spot on his finger. "Suspecting that the spot might be dried blood and knowing that evidence of strangulation is often found under the assailant's fingernails, the police asked Murphy if they could take a sample of scrapings from his fingernails. He refused." *Id.* at 292. Murphy "put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a 'metallic sound, such as keys or change rattling' was heard." *Id.* at 296. Thereupon, against his wishes, his nails were scraped. The scrapings linked him to the murder of his wife.

Since Murphy was briefly confined while his nails were scraped, it was necessary for the court to decide the propriety of this detention. Said the Court:

"[T]he detention of the respondent against his will constituted a seizure of his person, and the Fourth Amendment guarantee of freedom from 'unreasonable searches and seizures' is clearly implicated, cf. United States v. Dionisio, 410 U.S. 1, Terry v. Ohio, 392 U.S. 1, 19 . . . .

"In Davis [*v. Mississippi,* 394 U.S. 721 (1969)], the Court held that fingerprints obtained during the brief detention of persons seized in a police dragnet procedure, without probable cause, were inadmissible in evidence . . . .

---

[9] Mr. Justices DOUGLAS, BRENNAN, WHITE, and MARSHALL maintained that the existence of probable cause was an open question, because it had not been considered by the Court of Appeals.

"[T]he Court held the station house detention in that case to be violative of the Fourth and Fourteenth Amendments 'Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention.' " *Id.,* at 726.

"The respondent in this case, like Davis, was briefly detained at the station house. Yet here, there was, as three courts have found, probable cause to believe that the respondent had committed the murder. The vice of the detention in Davis is therefore absent in the case before us. Cf. United States v. Dionisio, *supra.*" Id. at 294-95.

The Court's inquiry continued since Murphy had also been subjected to a search of his person in that his fingernails were scraped. *See generally United States v. Dionisio, supra.* The Court ruled that the search was "constitutionally permissible under the principles of Chimel v. California," *supra:*

"Where there is no formal arrest, as in the case before us, a person might well be less hostile to the police and less likely to take conspicuous, immediate steps to destroy incriminating evidence on his person. Since he knows he is going to be released, he might be likely instead to be concerned with diverting attention away from himself. Accordingly, we do not hold that a full Chimel search would have been justified in this case without a formal arrest and without a warrant. But the respondent was not subjected to such a search.

"At the time Murphy was being detained at the station house, he was obviously aware of the detectives' suspicions. Though he did not have the full warning of officials suspicion that a formal arrest provides, Murphy was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention. Testimony at trial indicated that after he refused to

consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a 'metallic sound, such as keys or change rattling' was heard. The rationale of Chimel, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails, cf. Schmerber v. California, 384 U.S. 757.

"On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments." *Id.* at 296.

In considering the applicability of *Cupp v. Murphy* to the present case, the first issue that must be noted concerns the detention of the driver. Because Murphy voluntarily went to the police station, his brief detention by the police involved no transportation. The Court indicated that the existence of probable cause distinguished the case before it from *Davis*, and cured "the vice of the detention" there. In *Davis* the defendant was taken along with many other black young men to police headquarters where all were briefly questioned, fingerprinted, and released. If probable cause really cures the vice of this procedure, then perhaps transportation of a suspect for the limited purpose of obtaining physical evidence is constitutionally permissible provided there is probable cause. There are, however, a number of reasons not to read *Murphy* so broadly. Certainly transporting a person may place a greater burden upon his sense of security than does mere detention in the place where police officers first come upon him. The places where a person may be taken for examination or testing—a police station or a hospital—may be considered threatening by many. For them, it would be pref-

erable to stay in more open and familiar surroundings. Many people would be embarrassed to be taken to a police station because of the possibility that someone they know might see them there. Such embarrassment should be spared those who are not under arrest. In addition, transporting a person for examination or testing and returning him to the point where he was picked up may in some cases cause unwarranted inconvenience. The need to transport a person for examination or testing will vary with the nature of the testing desired. To scrape Murphy's nails required no special equipment or conditions. It appears that equipment for taking fingerprints[10] and administering breathalyzer tests[11] can be put on mobile police units and taken to the person the police wish examined or tested. Given mobile equipment, there is no absolute necessity for the person to be taken anywhere. The scope of a seizure must be strictly limited in terms of the circumstances that justify it. *Terry v. Ohio, supra* at 19-20. If the purpose of seizing a person can be fulfilled without transporting him, there is no justification for transportation. The interests of the police do not outweigh those of the person who would be transported.[12] For these reasons, *Murphy*

---

[10] *See, e.g., Commonwealth v. Jefferson*, 445 Pa. 1, 281 A. 2d 852 (1971) (defendant fingerprinted in courtroom as part of demonstration).

[11] *See* Watts, Some Observations on Police-Administered Tests for Intoxication, 45 N.C. L. Rev. 34, 49-77 (1966) (discussion of the various procedures and apparatuses for testing blood, breath, and urine to determine level of intoxication). *See also* N.Y. Vehicle & Traffic Law §1193-a (McKinney) (authorizing on-the-spot breathalyzer tests in the absence of a lawful arrest); Smith, Using the Alcohol Screening Test on Motor Vehicle Operators, 35 Albany L. Rev. 455 (1971).

[12] This conclusion, it should be noted, is contrary to the conclusion that has been reached in automobile cases. Under *Carroll v. United States*, 267 U.S. 132 (1925), an automobile may be searched where probable cause coincides with exigent circumstances. The

should be limited to its facts and read as permitting brief detention (but not transportation) solely on the basis of probable cause.

The next issue concerns the sort of search permitted during a brief detention of the driver. The Court in *Cupp v. Murphy* characterized the scraping of Murphy's fingernails as a "very limited intrusion." A breathalyzer test is comparably limited. A blood test is less limited because the surface of the skin is pierced. The test therefore requires a medical procedure involving some risk of harm, pain, or infection. Even so, it seems apparent that a blood test is permitted under *Murphy*. The Court cites *Schmerber* in reference to its conclusion that the search of Murphy was a "very limited intrusion necessary to preserve . . . highly evanescent evidence." *Id.* at 296. Moreover, *Schmerber* and the implied consent law both require that the choice of taking blood be a reasonable one and that the blood be taken in a reasonable manner.[13]

---

police are not required to make an immediate search at the point where the car is stopped; rather they are given the option of taking the automobile to a police station and searching it there. *Chambers v. Maroney*, 399 U.S. 42 (1970). *See generally Commonwealth v. Maione, supra.* The correctness of the *Chambers* holding in terms of the interests of the police and of drivers is suggested in Note, Warrantless Searches and Seizures of Automobiles, 87 Harv. L. Rev. 835, 841-45 (1974). Where persons are involved, a balancing of the interests leads to a different result. It may be that in certain circumstances examination or testing at the scene with mobile equipment would not be practical or safe, in which case transportation might be warranted. *Cf. Commonwealth v. Smith*, 452 Pa. 1, 14, 304 A. 2d 456, 463 (1973) (ROBERTS, J., dissenting). It is not suggested that such a case is presented here, however, and the point may therefore be left open.

[13] *See* note 1, *supra* and accompanying text. The implied consent law permits blood tests to be requested where "a person is physically unable to supply enough breath to complete a chemical test . . . ," in which case the test must be conducted by "a physician or a technician acting under his direction." The Vehicle Code, *supra* §624.1(f), 75 P.S. §624.1(f).

The remaining issue concerns the basis for detaining and testing the driver.

*Cupp v. Murphy* in effect holds that there may be a seizure and a search incident to that seizure without an arrest if the officer has "probable cause" to arrest. The implied consent law authorizes a seizure and a search incident to that seizure without an arrest if the officer has "reasonable grounds" to believe that a person has been driving under the influence of intoxicating liquor. It has been seen that the extent of the seizure and search authorized by the implied consent law may be brought within *Murphy,* i.e., a brief detention, and a limited intrusion for evanescent evidence. The same may be done with respect to the basis for the seizure and search.

The implied consent law does not define "reasonable grounds." There may be no doubt that "reasonable grounds" exist where there is "probable cause," for "probable cause" means that the officer has knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man in the belief that the person seized has committed a crime. *Commonwealth v. Hicks, supra* at 158, 253 A. 2d at 279. If the ambiguity in the meaning of "reasonable grounds" is resolved by construing "reasonable grounds" to mean "probable cause," the implied consent law may be upheld as constitutional within *Murphy.* There is no good reason not to adopt this construction, especially considering the presumption "[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth." 1 Pa. S. §1922(3).

It is necessary to add a *caveat.* Murphy was detained and searched in order to save destructible evidence linking him to the murder of his wife. Any broader search not furthering that purpose would apparently have been held illegal absent a complete ar-

rest.[14]  Accordingly, under *Murphy* a person may upon reasonable grounds be detained for testing the alcoholic content of his body, but where the purpose for such seizure extends beyond testing, an independent basis for the seizure, such as a legal arrest, must be advanced. Also, where the search of the person extends beyond what is necessary to test the alcoholic content of the person's body, an independent basis for the search must be advanced.

### Conclusions

1.  A blood or breathalyzer test that can be administered without transporting a person may be conducted if the requesting officer has reasonable grounds to believe the person to have been driving while intoxicated.

2.  To transport a person to a place where a test of his blood or breath will be conducted, a lawful arrest

---

[14] This point is emphasized in the concurring opinion by Mr. Justice MARSHALL: "Murphy's argument is, of course, a troublesome one, and, if the police had done more than take fingernail scrapings, I would be inclined to hold the search illegal. For, as a general principle of the law of the Fourth Amendment, the scope of a search must be strictly limited in terms of the circumstances that justify the search. See, *e.g.*, Terry v. Ohio, *supra*, at 19-20; Chimel v. California, 395 U.S. 752 (1969). When a person is detained, but not arrested, the detention must be justified by particularized police interests other than a desire to initiate a criminal proceeding against the person they detain. The police therefore cannot do more than investigate the circumstances that occasion the detention. In this case, the police limited their intrusion to precisely the area that led them to restrict Murphy's freedom; he was not searched as extensively as he might have been had an arrest occurred. Indeed, in my view, the Fourth Amendment would have barred a more extensive search, for the police had no reason at all to believe that Murphy had on his person more evidence relating to the crime, or, in light of the fact that this case involved a strangulation, a weapon that he might use at the station house." *Cupp v. Murphy, supra* at 298-99.

is required (except perhaps in exceptional circumstances—a question not here decided; see f.n. 12, *supra*).

3. Where the detention extends beyond the limited purpose of testing the level of a person's intoxication, and the searching goes beyond such testing, a lawful arrest is required.

4. In accordance with the foregoing, appellee might have been tested at the scene, but he could not without his actual consent be transported twenty-two miles to the police barracks for testing, unless he was under legal arrest. He was not. The results of the breathalyzer test were therefore properly suppressed.

The order of the court below is affirmed.

WATKINS, P. J., and HOFFMAN and CERCONE, JJ., concur in the result.

WRIGHT, P. J., and SPAULDING, J., did not participate in the consideration or decision of this case.