293 So.2d 865

**Totsie Lee CUNNINGHAM**

v.

**STATE.**

**6 Div. 570.**

Court of Criminal Appeals of Alabama.
April 23, 1974.

Earl F. Hilliard, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and David L. Weathers, Asst. Atty. Gen., Birmingham, for the State.

HARRIS, Judge.

Appellant was convicted of robbery and sentenced to ten (10) years in the penitentiary. He was represented in the court below by counsel of his choice and pleaded not guilty at arraignment. He retained new counsel to represent him on appeal.

The facts in this case are not complicated, though there is a sharp dispute in the testimony of the victim and that adduced on behalf of the accused.

On the night of November 23, 1971, around eight o'clock, a lawyer from Acworth, Georgia, was in a laundromat on 24th Street in the City of Birmingham to get some clothes washed and dried. He was staying at the Holiday Inn near the Civic Center. He and his wife were in Birmingham to visit her father who was in a local hospital suffering from injuries sustained in an accident.

Some six or more people were using the facilities of the laundromat when the victim of the robbery arrived. He found a washer not in use and put his clothes in and his money in the coin operating device.

At the time his clothes were washed and ready for the dryer, he noticed that he was alone in the place. He put his clothes in the dryer and was looking at a magazine when a young black male came in the place. He saw two more young black men at the door. He had observed all three walk past the laundromat and look in before one entered. He judged their ages to range from fifteen to seventeen.

The victim further testified that the boy who first entered the laundromat asked him for fifty cents or a dollar and he replied that he only brought enough change to use in the washer and dryer. This boy then rejoined his companions and they walked outside the building but he observed them through a glass window. While they were outside the building he removed $150.00 to $200.00 from his billfold and stuck it in one of his shoes. He got his clothes from the dryer, folded them and placed them in a laundry bag and was in the process of putting his shirts on hangers when the three boys re-entered the building and sat on some chairs in the back. The victim gathered his clothes and turned to the boys and said he would see them around sometime and started walking toward the front door. After taking a few steps, he heard the rush of feet behind him and one of the boys grabbed him around the neck from the rear. The other two grabbed each of his arms and his shirts and laundry bag fell to the floor. While two of them held his arms, the third boy started hitting him in the stomach and one or more were saying, "Get his money, get his money." One got his billfold and there was nothing in it except credit cards. The victim told them if they were ever found with those credit cards they would be put in jail. He then recovered his billfold and credit cards. One of the boys said, "Get his watch", and the boy the victim later identified as appellant snatched his wristwatch off his arm, breaking the band, and got possession of the watch. Appellant then struck the victim a hard blow on the back of his head which rendered him grog-gy. The boys hurriedly left the laundromat and the victim picked up his clothes, got in his car and drove a few blocks to a well-lighted service station where he used the telephone to call the police department. Two patrol cars responded immediately and the victim went to police headquarters and filed a complaint.

The robbery occurred on Tuesday, November 23, 1971, and the victim returned from Georgia the following Saturday. He was contacted at his hotel by a police officer who showed him a wristwatch and he identified the watch as the one that was taken off his arm during the robbery. It was a Seiko make watch and at the time it was taken from him, it had a metal band, bluish in color, that snapped together. It had names on the band such as "Paris, London" or "Tokyo", and was described as a navigator's watch. When the police officer showed him the watch, the metal band was missing and a wide leather brown band inlaid with copper studs was on the watch. However, he positively identified the watch and made a positive in-court identification of appellant as the boy who had robbed him of his watch.

The conduct of the investigation of this robbery led to the home of appellant and his brother, Arthur Cunningham, who lived with their mother, step-father, and other brothers and sisters. Lieutenant Sprayberry, who was in charge of the investigation, went to appellant's home. The boys were not there. The Lieutenant talked to their mother and step-father and told them the boys were suspects in a robbery in which a watch was taken and the mother told him that appellant had been wearing a watch and that she did not know where he had gotten it, but she knew he did not have any money to buy it. She told the officer she would call him back when the boys returned home. She called the officer later and he went back to her home. She told appellant to go and get the watch and give it to the officer. Appellant balked at his mother's request and put up an argument but finally he went somewhere in the back

of the house and returned with the watch and personally handed it to the officer. The officer then and there arrested appellant and his brother for the offense of robbery and carried them to the patrol car. Before backing out of the driveway, the officer gave both boys the *Miranda* warnings. The boys said they understood their rights but if they had to go to jail, "Payne has got to go, too." The officer asked them if they knew where Payne lived and they gave him the address. The officer went to this address and arrested William Payne and charged him with robbery. These three boys were subsequently indicted for robbery by a Jefferson County Grand Jury.

Lieutenant Sprayberry showed the robbery victim a number of mug shots and he immediately identified appellant and his brother, Arthur Cunningham, as two of the boys who had robbed him. A photograph of Payne was not in the mug shots shown the victim.

Appellant sought to prove an alibi and had his brother, mother and a second cousin to support his story. He testified that he, Payne and his brother, Arthur, were walking to town on the Saturday morning after the robbery the previous Tuesday and Arthur found the wrist-watch in some grass a short distance from the laundromat where the crime was allegedly committed; and, too, that it was Arthur who handed the watch to the officer after being told to do so by his step-father. Further, that they did not go to the laundromat on Tuesday night of the alleged robbery, but were at home that night singing songs to tunes emanating from a record player; that they played the record player and sang songs until around eleven p. m., when their mother made them stop the noise and go to bed.

Appellant complains that he was denied a fair and impartial trial because one of the jurors on the trial panel went to sleep on more than one occasion during his trial; and at one point, he made a motion for a mistrial on this ground.

On page 48 of the record, we find the following (after an off-the-record discussion between the court and counsel):

"THE COURT: What is your name, sir, on the end?

"JUROR: Morton.

"THE COURT: Morton?

"JUROR: Yes, sir.

"THE COURT: Mr. Morton, are you having a difficult time staying awake?

"JUROR: No, sir, not too bad.

"THE COURT: Well, I don't want you to go to sleep while this case is in progress.

"JUROR: I am not.

"THE COURT: All right, you keep your attention glued to what's being said and what transpires in the courtroom here, if you will.

"JUROR: All right, sir."

The trial continued. Later a conference was held in the Judge's Chambers and after returning to the courtroom, appellant's counsel made the following statement:

"MR. SHOTTS: Judge, I hate to but I am going to have to make a motion for a mistrial. The gentleman is not paying attention. He has been asleep. On no occasion has he been awake. I hate to prejudice my client's position in this posture with a juror out of the ball game."

Thereupon the following occurred:

"THE COURT: I haven't seen him asleep. When I said something to him for you—have you seen him—

"MR. SHOTTS: Yes, sir, on two occasions. I am willing to proceed if he stays awake.

"THE COURT: I am going to bring him down on the front row down in front of me.

"MR. BROWN: Since we are on record may I say something? While Mr. Shotts was outside conferring with the next prospective witness, I heard deep breathing in that section and obviously it was Mr. Morton. Sometimes I thought he was asleep, at least to say to the Court apparently he has a breathing problem, if not asleep. His head was down. His eyes were open.

"THE COURT: His eyes were open?

"MR. BROWN: Yes, sir.

"THE COURT: I haven't heard deep breathing. On the first occasion his eyes have been open. Well, I have tried to watch the man since some mention was made about it. I admonished him about it. I don't want to embarrass him unnecessarily but I am beyond the point where embarrassment is involved. I want this defendant and the State to have a fair and impartial trial. I can bring him down on the front row in the first position where I can observe him constantly. Would that be satisfactory to the defense?

"MR. SHOTTS: Yes, sir, the only thing I want is a guarantee—

"THE COURT: You want him to hear the testimony. We can't guarantee paying attention. All right.

"MR. SHOTTS: Thank you."

Thereupon, the court, both counsel, the defendant and the court reporter returned to the courtroom and the following occurred:

"THE COURT: Mr. Morton, I wonder if you would change places with this lady right here. Come sit right here if you would and let her sit over there if you would, please, sir.

"JUROR: Yes, sir.

"THE COURT: Do you have some problem with your breathing? Do you have asthma or something like that?

"JUROR: A little, not too bad."

The trial continued. Later the record reveals the following:

"THE COURT: Mr. Morton, are you awake?

"JUROR: Yes, sir.

"THE COURT: All right, keep your eyes open and look at the witness. I direct you to do that if you will unless you are ill. If you are ill, let the Court know. All right."

█ It will be noted that the trial court had this juror under his watchful eye throughout the trial. It is also manifestly clear that no ruling of the court was invoked on a motion for a mistrial.

In Shadle v. State, 280 Ala. 379, 194 So. 2d 538, the Supreme Court said:

"[It] is well recognized that the granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And he will not interfere with the trial judge unless there has been a clear abuse of discretion. * * * *"

No error intervened in the action of the trial judge with respect to this juror.

█ Appellant next asserts error in the admission of Lieutenant Sprayberry's testimony with reference to the delivery of the wristwatch to him by appellant. He claims this was an unlawful search and seizure in the absence of a valid search warrant. No search of any kind, nature or description was conducted by the police officer in this case. He came into possession of the watch by virtue of a voluntary manual delivery of it to him by appellant and not by a search. The appellant's contentions on this issue are completely answered by Smith v. State, 41 Ala.App. 528, 138

So.2d 474; and Dannelly v. State, 47 Ala. App. 363, 254 So.2d 434.

In Smith v. State, supra, we held that a "search" implies probing into secret places for that which is hidden; it implies force, actual or constructive, or a forceable dispossession of property of one by exploratory acts.

In Dannelly v. State, supra, we held that the voluntary manual delivery of a gun to the sheriff did not involve an illegal search and seizure and was admissible in evidence.

We find no error in the record that in any wise injuriously affected the substantial rights of appellant.

Affirmed.

All the Judges concur.