WELCH, Judge.
 

 Corey Lee Williams was convicted of assault in the second degree for injuries he inflicted upon a police officer during the course of the officer’s duties, a violation of § 13A-6-21(a)(4), Ala.Code 1975. Williams was sentenced to ten years’ imprisonment and was fined $2,000.
 

 The evidence adduced at trial tended to show the following. On the afternoon of March 11, 2006, Opelika police officers Gary Jernigan and James Daniel separately responded to a report of possible drug activity at the corner of South 4th Street and Bankston Alley in Opelika. Neither officer saw anyone at the corner, so Officer Jernigan told Officer Daniel they needed to drive down Bankston Alley to investigate. Officer Daniel’s car was ahead of Officer Jernigan’s car as they drove down the street, which was described as a one-way dead-end street about 100 yards long at most. The houses along the street have little room between them.
 

 The officers saw two men outside of a house about halfway down Bankston Alley. The officers stopped their patrol cars and approached the two men. At the time, the officers did not know who the men were. They were later identified as Clint Flakes and Tyrone Flakes. Officer Jernigan asked Tyrone “what he was doing there” (R. 136) and explained that the police were investigating a report of drug activity in the area.
 

 Clint began loudly complaining and cursing. Officer Jernigan said he asked Clint to calm down, but Clint became belligerent and “giving [him] that stare. A real mean stare.” (R. 190.) The Flakeses refused to show the officers their identification. Clint finally admitted there was a warrant pending for his arrest and said, “Come get me, motherfuckers.” (R. 192.) At that point, Officer Jernigan told Clint he was arresting him for disorderly conduct, and Clint turned and ran inside the house.
 

 Officer Jernigan and Officer Daniel followed Clint into the house, with Officer Jernigan in the lead. Clint ran into the kitchen. As Officer Jernigan entered the
 
 *288
 
 kitchen, somebody hit him from the right, knocking him to the floor and knocking off his glasses. Officer Jernigan said he lost consciousness for a brief time.
 

 Officer Daniel sprayed Officer Jerni-gan’s assailant with Freeze Plus P brand mace and then began to fight with him. Officer Daniel could not identify Officer Jernigan’s assailant. While Officer Daniel was fighting with that person, however, someone knocked the mace from his hands and he was hit on the head from behind. Officer Daniel said he was assaulted by three people.
 

 Officer Jernigan came to on the ground to someone kicking him in the face. He testified that four black males were involved in the assault on him and Officer Daniel, but he could not identify any of them except Clint Flakes. Officer Jerni-gan was able to get on his hands and knees and spray mace on the person on top of him and the two that were on top of Officer Daniel. Officer Daniel grabbed one of his assailants around the leg and was able to pull of his shoe before the assailant fled. Neither officer sprayed mace again at the house. Medical records show that Officer Jernigan suffered a broken nose in the assault.
 

 The people involved in the assaults of the officers fled the house. Some suspects who were known to the officers were identified from a patrol car videotape showing the assailants as they fled the house. One suspect seen on the tape was not identified. One of the officers’ patrol cars was blocking a car at the house. An investigation showed that the car belonged to Williams.
 

 Officer Jernigan testified that the Freeze Plus P mace had a range of seven to 10 feet as it left the can. Martin Cash, a distributor of Freeze Plus P mace, testified that when the mace is sprayed, it does not disseminate like an aerosol, but shoots in a straight stream. The mace contains a fluorescent substance that glows under ultraviolet light, or a black light. The substance becomes embedded in the skin and is difficult to wash off. The substance, invisible to the naked eye, can be detected by black light up to 72 hours. The substance is intended to allow police to identify people who have been sprayed with mace when they are placed under a black light.
 

 On the morning of March 13, 2006, less than 48 hours after the assault had taken place, the suspects whom police had identified and Williams came to the police station for questioning.
 
 [1]
 
 Williams was advised of his rights pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he made a statement in which he never admitted striking either Officer Jernigan or Officer Daniel. He refused to sign the statement.
 

 After making the statement, Williams was asked to go to another office. He went with several police officers to a windowless room with ordinary lighting. In that office, an ultraviolet light and a digital camera were mounted on a tripod. The ordinary lighting was turned off, and the ultraviolet light was turned on. The officer could see on Williams’s skin a fluorescent pattern consistent with that of someone who had been directly sprayed with Freeze Plus P, and not from a possible hit from mace sprayed over a large area. The officer photographed the fluorescent pattern. After Williams was photographed, he was allowed to leave the police station.
 
 *289
 
 He was arrested and charged with the assault four days later.
 

 I.
 

 Williams contends that the trial court improperly denied his motion to suppress the photograph taken under ultraviolet light at the Opelika police station. Specifically, Williams argues that the photograph taken of him showing a fluorescent pattern constituted an illegal search.
 

 The suppression hearing on the issue whether the photograph of Williams taken under ultraviolet light was due to be suppressed was held outside the presence of the jury; therefore, we would ordinarily review the evidentiary findings of the trial court under the ore tenus standard.
 
 Ex parte Jackson,
 
 886 So.2d 155, 159 (Ala.2004). However, here, the evidence adduced at the suppression heai’ing regarding how the photographs came to be taken and the manner in which they were taken was undisputed. ““Where the evidence before the trial court was undisputed the
 
 ore tenus
 
 rule is inapplicable, and [this Court] will sit in judgment on the evidence
 
 de novo,
 
 indulging no presumption in favor of the trial court’s application of the law to those facts.” ’ ”
 
 Jackson,
 
 886 So.2d at 159, quoting
 
 State v. Hill,
 
 690 So.2d 1201, 1203 (Ala.1996), quoting in turn
 
 Stiles v. Brown,
 
 380 So.2d 792, 794 (Ala.1980).
 

 “Generally, photographs are admissible into evidence in a criminal prosecution ‘if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.’
 
 Magwood v. State,
 
 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986),
 
 cert. denied,
 
 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
 
 See also Woods v. State,
 
 460 So.2d 291 (Ala.Crim.App.1984);
 
 Washington v. State,
 
 415 So.2d 1175 (Ala.Crim.App.1982); C. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 207.01(2) (3d ed.1977).”
 

 Bankhead v. State,
 
 585 So.2d 97, 109 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993).
 

 Alabama’s appellate courts have not addressed this issue. In the past, this court has held that, “[i]n the context of the Fourth Amendment, ‘a “search” implies probing into secret places for that which is hidden [and] implies force, actual or constructive, or a forceable dispossession of property of one by exploratory acts.’
 
 Cunningham v. State,
 
 52 Ala.App. 440, 293 So.2d 865 (1974);
 
 Knox v. State,
 
 50 Ala.App. 494, 280 So.2d 200 (1973).”
 
 Vogel v. State,
 
 426 So.2d 863, 872 (Ala.Crim.App.1980). Additionally, this court has held that
 

 “in general, the mere observation of a person’s physical characteristics does not constitute a Fourth Amendment search. See
 
 Nguyen v. State,
 
 547 So.2d 582, 585 (Ala.Crim.App.1988). ‘ “Moreover, it is no search to ‘record’ those characteristics, in effect, by taking a picture of the individual.” ’
 
 Nguyen v. State,
 
 547 So.2d at 585, quoting LaFave,
 
 Search and Seizure,
 
 § 2.6(a) (1987).”
 

 Powell v. State,
 
 796 So.2d 404, 428-29 (Ala.Crim.App.1999).
 

 As Professor Wayne LaFave points out, courts across the United States have struggled with the issue of whether use of an ultraviolet light to reveal whether a suspect has come in contact with a certain object or has been in a certain place constitutes a “search.” 1 Wayne R. LaFave,
 
 Search and Seizure
 
 § 2.2(d) (4th. ed.2004). Of the relatively few jurisdictions that
 
 *290
 
 have addressed the issue, the majority have found that it does not. The United States Supreme Court has not addressed the issue.
 

 Professor LaFave cites
 
 Commonwealth v. DeWitt,
 
 226 Pa.Super. 372, 314 A.2d 27 (1973), as illustrative of those cases in which courts have determined that use of an ultraviolet light in such instances does not constitute a search. In that case, customs agents found hashish hidden in a table with a false top, which had been shipped into the United States from overseas. The agents treated the hashish with fluorescent grease, repackaged it, and allowed it to be delivered. Agents then went to the address where the delivery had been made to execute a warrant for the hashish. While there, they passed an ultraviolet light over the hands of the defendants and learned that they had handled the hashish. Just as in the instant case, the defendants claimed that use of the ultraviolet light constituted an illegal search. The Pennsylvania Superior Court disagreed and wrote as follows:
 

 “[Defendants had no reasonable expectation of privacy as to the presence of foreign matter on their hands independent of the expectation of the privacy of their premises, which had been legitimately invaded by the police. The grease may be compared to a physical characteristic, such as a fingerprint or one’s voice, which is ‘constantly exposed to the public.’
 
 United States v. Dionisio,
 
 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). The Fourth Amendment provides no protection for what ‘a person knowingly exposes to the public.’
 
 Katz v. United States,
 
 [389 U.S. 347] at 351 [ (1967) ].... It is true that the grease could not be detected with the naked eye, but then, neither may a fingerprint be examined until there has been an application of ink. Furthermore, the examination was both limited and controlled, affording no opportunity to learn any information other than that specifically sought: Have the person’s hands been in contact with the treated contraband? In this respect, the examination was more circumscribed than any eavesdropping, electronic surveillance, long-distance viewing with binoculars, or even the use of a flashlight. Also, it involved no personal indignities or physical discomfort, and was neither annoying, frightening, or humiliating.
 
 Terry v. Ohio,
 
 392 U.S. 1, 25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
 

 “In these circumstances the use of the ultraviolet light to examine defendants’ hands did not amount to a search. It may well be that in other circumstances an examination by ultraviolet light would amount to a search.”
 

 DeWitt,
 
 314 A.2d at 30-31. See also
 
 United States v. Ukomadu,
 
 236 F.3d 333, 338 (6th Cir.2001) (citing with approval
 
 United States v. Richardson,
 
 388 F.2d 842, 845 (6th Cir.1968) (holding “[w]e do not regard the examination of appellant’s hands under the ultraviolet light as a search within the meaning of the Fourth Amendment”));
 
 United States v. Williams,
 
 902 F.2d 678, 680-81 (8th Cir.1990) (an ultraviolet light examination does not constitute a search for purposes of the Fourth Amendment);
 
 Williams v. City of Lancaster,
 
 639 F.Supp. 377, 382 (E.D.Pa.1986); and
 
 United States v. DeMarsh,
 
 360 F.Supp. 132, 137 (E.D.Wis.1973).
 

 Other courts, on the other hand, have found use of an ultraviolet light on a defendant’s body to be a search. Professor LaFave uses
 
 United States v. Kenaan,
 
 496 F.2d 181 (1st Cir.1974), as an example of the reasoning courts have used to reach that conclusion. The facts in
 
 Kenaan
 
 are similar to those in
 
 DeWitt.
 
 In
 
 Kenaan,
 
 the United States Court of Appeals for the
 
 *291
 
 First Circuit explained its holding as follows:
 

 “Appellant contends that the results of the inspection of his hands should have been suppressed at trial, since the inspection was, in effect, a personal search unauthorized by the warrant to search the premises. There can be little doubt that an inspection of one’s hands, under an ultraviolet lamp, is the kind of governmental intrusion into one’s private domain that is protected by the Fourth Amendment.
 
 Mancusi v. DeForte,
 
 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968);
 
 Warden v. Hayden,
 
 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). If the reach of the Fourth Amendment extends to fingerprinting,
 
 Davis v. Mississippi,
 
 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and a search of one’s clothing or personal effects,
 
 United States v. Micheli,
 
 487 F.2d 429 (1st Cir.1973), it should certainly encompass a detailed inspection, by special instrument, of one’s skin.”
 

 Kenaan,
 
 496 F.2d at 182. See also
 
 People v. Santistevan,
 
 715 P.2d 792, 794-95 (Colo.1986); and
 
 State v. Hardaway,
 
 307 Mont. 139, 36 P.3d 900 (2001) (overruling
 
 State v. Holzapfel,
 
 230 Mont. 105, 748 P.2d 953 (1988) (viewing defendant’s hands under an ultraviolet light was not a search) in determining that swabbing defendant’s hands for blood evidence without a warrant constituted an unlawful search).
 

 We question the assertion in
 
 Kenaan
 
 that taking a fingerprint constitutes a search: this court has held that taking the fingerprints of a person who is not under arrest does not constitute a search under the Fourth Amendment.
 
 Nguyen v. State,
 
 547 So.2d 582, 585 (Ala.Crim.App.1988).
 

 In
 
 Nguyen,
 
 police fingerprinted and photographed a man, Thanh Ba Tiet, and three others at the police station, where the men were attempting to secure a friend’s release from jail. A policeman testified that he took the fingerprints and photographs because he had learned that a previous robbery he was investigating had been perpetrated by Vietnamese. Thanh Ba Tiet and the others with him were not under arrest, and Thanh Ba Tiet said that he did not give his consent to be fingerprinted and photographed. This court held that even though he was not under arrest, taking his fingerprints and photograph “did not constitute an unconstitutional search” because the action merely “recorded” characteristics constantly exposed to the public.
 
 Nguyen,
 
 547 So.2d at 585.
 

 Under settled Alabama law, a “search” involves probing into secret places for that which is hidden, and implies a forcible dispossession of property of one by exploratory acts. In this case, police merely had Williams enter a room. When the room was darkened and an ultraviolet light was turned on, a fluorescent pattern appeared on Williams’s face. Williams was not asked to bare any part of his body that was not already open to public view. Police did not have to touch his body in an attempt to discover whether a fluorescent pattern would emerge. It involved no personal indignities or humiliations. We fail to see that having one’s photograph made while under an ultraviolet light is any more or less intrusive than having a photograph taken under any other circumstances. See, e.g.,
 
 Nguyen.
 
 Therefore, we hold that law enforcement’s use of ultraviolet light, without more, to determine whether a suspect has come in contact with a fluorescent substance does not constitute a search.
 

 We recognize that in
 
 Davis v. Mississippi,
 
 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the United States Supreme Court found that fingerprints taken during
 
 *292
 
 the brief detention of the suspect at the police station were subject to exclusion from evidence because the prints were taken while the suspect was being improperly detained without probable cause. In
 
 Davis,
 
 the suspect was one of at least 24 black youths who, as part of a dragnet, were brought in to the Meridian, Mississippi, police station without probable cause or a warrant, driven to a distant city, and held overnight so that law-enforcement officials could get fingerprints for use in their investigation of a rape.
 

 As pointed out above, in this case, it is not clear from the record how Williams arrived at the police station the day he was exposed to the ultraviolet light. There is no evidence as to whether he voluntarily came to the police station, or whether police brought him into the station for questioning. We do note, however, that after his photograph was taken, Williams was allowed to leave. Furthermore, in this case, unlike the situation in
 
 Davis,
 
 police already had evidence that Williams’s car was parked outside the house where the altercation occurred. Therefore, they already had grounds independent of the fluorescent marks to reasonably suspect that Williams may have been involved in the assault on the police.
 

 Moreover, Williams does not argue that he was either illegally detained or under arrest at the time he was exposed to the ultraviolet light. Therefore, based upon the record before us, we cannot say that the photograph taken of Williams under exposure to ultraviolet light was the fruit of an illegal detention.
 

 Accordingly, the trial court correctly denied Williams’s motion to suppress the photographic evidence at issue.
 

 II.
 

 Williams contends that the State failed to present sufficient evidence to convict him of assault in the second degree.
 

 “ ‘ “In reviewing the sufficiency of the evidence in criminal eases, we are to view the evidence and all inferences that may reasonably be drawn from it in a light most favorable to the government. ... Whether evidence is direct or circumstantial, we must accept all credibility choices that tend to support the jury’s verdict.... The standard of review is whether a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant’s guilt. If the jury could not reasonably have concluded that the evidence excluded every reasonable hypothesis but that of guilt, then we must reverse the convictions.”
 

 “
 
 ‘United States v. Hinds,
 
 662 F.2d 362, 366 (5th Cir.1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1720, 72 L.Ed.2d 140 (1982).’ ”
 

 Hamilton v. State,
 
 680 So.2d 987, 994-95 (Ala.Crim.App.1996).
 

 “Where a defendant’s conviction is based solely on circumstantial evidence, ‘if the circumstances can be reconciled with the theory that someone else
 
 may
 
 have done the act, then the conviction is due to be reversed.’
 
 Ex parte Brown,
 
 499 So.2d 787, 788 (Ala.1986) (emphasis in original). ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’
 
 White v. State,
 
 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’
 
 Cochran v. State,
 
 500 So.2d 1161, 1177 (Ala.Crim.App.1984), affirmed in perti
 
 *293
 
 nent part, reversed in part on other grounds,
 
 Ex parte Cochran,
 
 500 So.2d 1179 (Ala.1985). ‘It is not necessary for a conviction that the defendant be proved guilty to the “exclusion of every possibility of innocence.” ’
 
 Burks v. State,
 
 117 Ala. 148, 23 So. 530 (1898). ‘The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.’
 
 Howard v. State,
 
 108 Ala. 571, 18 So. 813, 815 (1895).”
 

 White v. State,
 
 546 So.2d 1014, 1017 (Ala.Crim.App.1989).
 

 Section 13A-6-21(a), Ala.Code 1975, provides, in pertinent part:
 

 “A person commits the crime of assault in the second degree if the person does any of the following:
 

 [[Image here]]
 

 “(4) With intent to prevent a peace officer, as defined in Section 36-21-60, ... from performing a lawful duty he or she intends to cause physical injury or he or she causes physical injury to any person.”
 

 Here, Williams was indicted for assaulting Opelika Police Officer Jernigan. The State presented evidence that two Opelika police officers, Jernigan and Daniel, were attempting to investigate a report of suspicious activity in the neighborhood when Clint Flakes became aggressive, admitted that there was a warrant pending against him, and told the officers to “come get” him. Officer Jernigan had entered the house into which Clint Flakes had fled and was attempting to arrest Flakes for disorderly conduct when both he and Officer Daniel were hit. Both men were knocked to the floor. Officer Jernigan suffered a broken nose in the fight.
 

 Although officers Jernigan and Daniel were unable to identify the men who assaulted them, they were able to determine that there were four men — other than themselves — involved in the fight. During the course of the fight, Jernigan’s nose was broken. Both officers were able to spray mace containing a fluorescent substance at their attackers.
 

 The police investigation showed that a car that had been blocked in at the house by one of the patrol cars belonged to Williams. When Williams came to the police department for questioning regarding the assault, he was led into a room that was darkened and an ultraviolet light was turned on in the room. Under the ultraviolet light, a fluorescent pattern consistent with a direct spray of Freeze Plus P mace was visible on Williams’s skin. From this evidence, a jury reasonably could have concluded that Williams participated in the fight with officers Jernigan and Daniel in an effort to prevent them from carrying out their legal duty in arresting Clint Flakes for disorderly conduct.
 

 Williams contends that there is no proof that he actually hit Officer Jerni-gan, and that even if he hit Officer Daniel, that should be considered a separate offense from the offense with which he was charged. Williams offers no authority in support of his assertion, which we find to be without merit.
 

 It is well settled in Alabama that “ ‘[a] person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 

 [[Image here]]
 

 “ ‘(2) He aids or abets such other person in committing the offense.... ’
 

 
 *294
 
 “§ 13A-2-23, Ala.Code 1975.
 

 “ ‘The words “aid and abet” encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary.
 
 Wright
 
 [v.
 
 State,
 
 494 So.2d 936 (Ala.Crim.App.1986) ];
 
 Sanders v. State,
 
 423 So.2d 348 (Ala.Crim.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. “The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.”
 
 Walls v. State,
 
 378 So.2d 1186, 1191 (Ala.Crim.App.1979), cert. denied,
 
 Ex parte Walls,
 
 378 So.2d 1193 (Ala.1980). Such facts as the defendant’s presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred.’
 

 “Henry v. State,
 
 555 So.2d 768, 769 (Ala.Crim.App.1989).”
 

 Peraita v. State,
 
 897 So.2d 1161, 1210 (Ala.Crim.App.2003).
 

 Accordingly, even if Williams hit Officer Daniel and did not actually hit Officer Jernigan, the jury could have concluded that in participating in the attack on officers Daniel and Jernigan, he was legally accountable for the actions of whichever individual actually hit Officer Jernigan.
 

 III.
 

 Williams contends that the trial court ignored the Voluntary Sentencing Standards of the Alabama Sentencing Reform Act of 2003, § 12-25-30 et seq., Ala.Code 1975 (the “Sentencing Act”), and instead sentenced him pursuant to the provisions of the Habitual Felony Offender Act, § 13A-5-9, Ala.Code 1975.
 

 The stated purpose of the Sentencing Act is “to protect public safety by providing a fair, effective, and efficient criminal justice system” through a variety of means, including the use of “[voluntary sentencing standards used to guide judicial decision makers in determining the most appropriate sentence for convicted felony offenders.” § 12—25—31(a)(1), Ala.Code 1975.
 

 However, the Sentencing Act specifically provides that “[fjailure to follow any or all of the provisions of this section [titled “Use of voluntary sentencing standards”], or failure to follow any or all of the provisions of this section in the prescribed manner,
 
 shall not be reviewable on appeal or the basis of any other post-conviction relief.”
 
 § 12-25-35(f), Ala.Code 1975 (emphasis added).
 

 Accordingly, this argument is without merit.
 

 For the reasons set forth above, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 McMILLAN and WISE, JJ., concur. BASCHAB, P.J., and SHAW, J, concur in the result.
 

 [1]
 

 . It is unclear from the record whether the suspects were brought in by police or whether they came voluntarily.