JOINER, Judge.
Charlie Frank Dardy was convicted of first-degree sexual abuse, see § 13A-6-66, Ala.Code 1975, and was sentenced as an habitual felony offender to 35 years’ imprisonment. In appealing his conviction and sentence, Dardy challenges only the trial court’s denial of his motion to suppress certain DNA evidence that law enforcement obtained from him. We affirm.

*545
Facts and Procedural History

On July 18, 2009, D.H. and M.S. left M.S.’s daughter, A.S., home alone with her then-17-year-old sister, C.S. A.S., who was 22 years old at that time, suffers from “Pervasive Developmental Disorder,” which is “part of the autism spectrum.” (R. 129.) A.S. can feed herself but requires someone to prepare her meals, bathe and dress her, and change her diapers. She has essentially no ability to communicate verbally.
When D.H. and M.S. returned, they found A.S. sitting on the steps outside their house with a man, later identified as Dardy, whom they did not know. Dardy was holding a beer, and he had one arm around A.S. A.S.’s pants were turned inside out, and she was holding her arm over her face. D.H. confronted Dardy, who claimed that A.S. had invited him over. When D.H. told Dardy that A.S. was autistic and could not talk, Dardy jumped on his bicycle and left.
Inside the house, D.H. noticed that there was blood on the dryer in the laundry room, and he asked M.S. to check A.S. M.S. found blood in A.S.’s diaper, and A.S.’s genitals were red, swollen, and irritated. D.H. then telephoned the police and provided them with a description of Dardy. A.S. was taken to the hospital.
Law-enforcement officers responding to the dispatch began looking for Dardy in the area of the crime. Officer Robert Bugg of the Opelika Police Department soon found Dardy and read him his Miranda [1] rights. Dardy agreed to return to the Opelika Police Department with Officer Bugg. During the ride, Dardy made several unsolicited comments; specifically, according to Officer Bugg, Dardy stated that “[Dardy] did not have sex with [A.S.] but she tried to entice him by pulling down her panties” and that “[Dardy] did not have sex with anyone, [he] did not rape anyone[;] take [A.S.] to the nurses station and you will not find sperm in her.” (R. 20.)
At the police station, Dardy was taken to an interrogation room. Detective Richard Converse testified that he met with Dardy and read him his Miranda rights. Detective Converse noticed that Dardy had dried blood on the nail beds of his fingers.[2] Aware that blood had been discovered at the scene, Detective Converse used distilled water and cotton swabs to obtain samples of the blood on Dardy’s hands. The Alabama Department of Forensic Sciences (“the Department”) performed DNA testing on those samples and determined that the blood was A.S.’s. The Department also tested samples taken from the blood found on the dryer at A.S.’s *546 residence; that testing revealed that the blood found on the dryer was A.S.’s.
After the test results were returned, Dardy was arrested and charged with first-degree sexual abuse. Dardy gave a voluntary statement in which he admitted being at A.S.’s house and providing her with beer.
Dardy filed a pretrial motion to suppress the results of the DNA testing that was performed on the blood that was swabbed from his hands. Dardy argued that the swabbing of the blood was an illegal warrantless search. Following a hearing, the trial court denied the motion.
Following a jury trial, Dardy was convicted of first-degree sexual abuse, and he was sentenced, as an habitual felony offender, to 35 years’ imprisonment.

Standard of Review

Because the hearing on Dardy’s motion to suppress the DNA evidence from the blood that was swabbed from his hands was held pretrial, “we would ordinarily review the evidentiary findings of the trial court under the ore tenus standard.” Williams v. State, 3 So.3d 285, 289 (Ala.Crim.App.2008) (citing Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004)). Here, however, the evidence “regarding how the [blood] came to be taken and the manner in which [it was] taken is undisputed.” Williams, 3 So.3d at 289. Therefore, “ ‘ “ ‘the ore tenus rule is inapplicable, and [this Court] will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’ ” ’ ” Williams, 3 So.3d at 289 (quoting Jackson, 886 So.2d at 159 (additional citations omitted)).

Discussion

Dardy argues that the trial court erred in denying the motion to suppress because, he says, the swabbing of dried blood from his hands was an unconstitutional warrantless search under the Fourth and Fourteenth Amendments to the United States Constitution. The State contends, however, that Dardy’s motion to suppress was properly denied. Specifically, the State argues in its brief that the officer’s collection of the blood evidence was not a search or seizure. Furthermore, the State argues, even if the collection of blood evidence was a search, it was proper under one or more of the exceptions to the warrant requirement. Thus, we are confronted with the following questions: Whether the collection of the blood from Dardy’s hands for potential DNA evidence constituted a search, and, if so, whether the collection was lawful in the absence of a warrant.
Our caselaw has not addressed the precise situation presented here. In State v. Hardaway, 307 Mont. 139, 36 P.3d 900 (2001), however, the Supreme Court of Montana addressed a situation involving the swabbing of a suspect’s hands for the purpose of obtaining blood on which to perform DNA testing. In that case, Hard-away was arrested following a report made to authorities concerning an intruder at a house. Hardaway was arrested in the area of the house, at which blood and broken glass had been found. The arresting officer noticed blood and fresh cuts on Hardaway’s hands, and after arresting Hardaway, the officer collected samples of the blood on Hardaway’s hands. Later testing matched the blood from Harda-way’s hands with blood found at the house.
Citing Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), for its analysis of what constitutes a search, the Supreme Court of Montana stated:
“[W]e conclude that Hardaway, like [the defendant] in Cupp, had a reasonable expectation of privacy as to his person and personal security. We further con- *547 elude that the warrantless swabbing of his hands for the purpose of obtaining evidence constituted a search subject to the protections of the federal and the Montana constitutions. While his hands and the blood upon them were exposed to the public for viewing, it was not the viewing that constituted the search; it was the swabbing.”[3]
307 Mont. at 147, 36 P.3d at 907.
In Cupp, the United States Supreme Court held that the taking of a suspect’s fingernail clippings to determine if they contained the victim’s blood was a search under the Fourth Amendment. In Cupp, the defendant voluntarily went to a police station for questioning regarding the murder of his wife. While the defendant was at the station, the police noticed a dark spot, which they suspected was dried blood, underneath his fingernails. Although the defendant refused a request for a fingernail-scraping sample, the police retrieved the samples without a warrant; the samples proved incriminatory and were later admitted at trial. The Supreme Court stated that “the search of [defendant’s] fingernails went beyond mere ‘physical characteristics ... constantly exposed to the public,’ and constituted the type of ‘severe though brief, intrusion upon cherished personal security’ that is subject to constitutional scrutiny.” 412 U.S. at 295. Ultimately, however, the Supreme Court held that the warrantless search was justified under the circumstances because of “the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence.” 412 U.S. at 296.
In Williams v. State, 3 So.3d 285, 289 (Ala.Crim.App.2008), this Court considered whether an examination of a defendant’s hands under an ultraviolet light constituted a search. In that case, Williams was questioned at a police station concerning an assault on police officers. The police officers who had been assaulted had used mace on their-assailants, which contained a fluorescent substance, visible under an ultraviolet light, that would become embedded in the skin and would be difficult to *548 wash off. After making a statement to the police, Williams was asked to go to another office in the station where there was an ultraviolet light. After the ultraviolet light was turned on, a police officer observed a fluorescent pattern on Williams’s skin and photographed it. Williams, arguing that the photograph of the fluorescent pattern taken under the ultraviolet light constituted an illegal search, moved to suppress it; the trial court denied the motion. On appeal, this Court stated:
“ ‘In the context of the Fourth Amendment, “a ‘search’ implies probing into secret places for that which is hidden [and] implies force, actual or constructive, or a forceable dispossession of property of one by exploratory acts.” Cunningham, v. State, 52 Ala.App. 440, 293 So.2d 865 (1974); Knox v. State, 50 Ala.App. 494, 280 So.2d 200 (1973).’ Vogel v. State, 426 So.2d 863, 872 (Ala.Crim.App.1980). Additionally, this court has held that
“ ‘[I]n general, the mere observation of a person’s physical characteristics does not constitute a Fourth Amendment search. See Nguyen v. State, 547 So.2d 582, 585 (Ala.Crim.App.1988). ““‘Moreover, it is no search to ‘record’ those characteristics, in effect, by taking a picture of the individual.” ’ ” Nguyen v. State, 547 So.2d at 585, quoting LaFave, Search and Seizure, § 2.6(a) (1987).’
“Powell v. State, 796 So.2d 404, 428-29 (Ala.Crim.App.1999).”
3 So.3d at 289. Further, this Court stated:
“Under settled Alabama law, a ‘search’ involves probing into secret places for that which is hidden, and implies a forcible dispossession of property of one by exploratory acts. In this case, police merely had Williams enter a room. When the room was darkened and an ultraviolet light was turned on, a fluorescent pattern appeared on Williams’s face. Williams was not asked to bare any part of his body that was not already open to public view. Police did not have to touch his body in an attempt to discover whether a fluorescent pattern would emerge. It involved no personal indignities or humiliations. We fail to see that having one’s photograph made while under an ultraviolet light is any more or less intrusive than having a photograph taken under any other circumstances. See, e.g., Nguyen. Therefore, we hold that law enforcement’s use of ultraviolet light, without more, to determine whether a suspect has come in contact with a fluorescent substance does not constitute a search.”
3 So.3d at 292. See also Nguyen v. State, 547 So.2d 582, 585 (Ala.Crim.App.1988) (taking of a defendant’s photograph and his fingerprints without consent and without an alleged basis for arrest did not constitute an unconstitutional search).
The circumstances in the present case are analogous to those presented in Cupp. Here, Detective Converse observed dried blood on Dardy’s hands and thereafter swabbed Dardy’s hands during the interview because Detective Converse knew that blood had been found at the scene of the sexual assault. Unlike the use of the ultraviolet light and the photographing in Williams, Detective Converse’s brief swabbing of Dardy’s hands in order to recover the dried blood subjected Dardy to an act having the characteristics of a search. Thus, the swabbing of Dardy’s hands before his arrest constituted “the type of ‘severe though brief, intrusion upon cherished personal security’ that is subject to constitutional scrutiny.” Cupp, 412 U.S. at 295.
Although the swabbing of Dar-dy’s hands “is subject to constitutional scrutiny,” we agree with the State that the *549 warrantless search was justified under the circumstances of this case.
“ ‘ “This court has long held that war-rantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement. See, e.g., Chevere v. State, 607 So.2d 361, 368 (Ala.Cr.App.1992). These exceptions are: (1) plain view; (2) consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency; (5) probable cause coupled with exigent circumstances; (6) stop and frisk situations; and (7) inventory searches. Ex parte Hilley, 484 So.2d 485, 488 (Ala.1985); Chevere, supra, 607 So.2d at 368.” ’ ”
State v. Otwell, 733 So.2d 950, 952 (Ala.Crim.App.1999) (quoting State v. Mitchell, 722 So.2d 814 (Ala.Crim.App.1998), quoting in turn Rokitski v. State, 715 So.2d 859 (Ala.Crim.App.1997)). Here, Dardy made spontaneous statements on the way to the police station denying that he had committed an assault; Dardy admitted to being with A.S. at the time of the alleged assault; there was blood in A.S.’s diaper and at her house; and blood was observed on Dardy’s hands shortly after the alleged assault. These facts provided probable cause to believe that the blood on Dardy’s hands was evidence of a crime. Because Dardy could have easily attempted to destroy the evidence by wiping it off or by putting his fingers in his mouth, exigent circumstances existed from “the ready destrueti-bility of the evidence.”[4] Cupp, 412 U.S. at 296. Thus, the warrantless search was justified under the probable-cause-coupled-with-exigent-circumstances exception.

Conclusion

Dardy has not demonstrated that the circuit court erred in denying the motion to suppress. Accordingly, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Specifically, Converse testified:
“[Detective Converse]: And then as I was sitting with him in the interview room, I noticed his hands, and I noticed what appeared to be blood on his hands, dried blood. I went, I got two swabbings and some distilled water and I swabbed his hands to collect that evidence.
"[Prosecutor]: All right. Now, you said that you were meeting with him and you noticed what appeared to be blood on his hand?
"[Detective Converse]: Yes, ma’am.
"[Prosecutor]: Could you tell the Court where you saw that?
"[Detective Converse]: It — it—on his fingers. And when I took the sample, it was like in the — like in the nail bed, Your Hon- or, where it — it stood out well there. I could see it.
"[Prosecutor]: Was this something that was readily apparent to you when you were meeting with Mr. Dardy?
"[Detective Converse]: Yes, ma’am.”
(R. 42-43.)

. In Hardaway, the Supreme Court of Montana further held that the warrantless search was not justified under any exception to the warrant requirement. That holding, however, was based on state-law grounds. Specifically, the court cited Article II, Section 10, of the Montana Constitution, which guarantees “Montana citizens a specific right to privacy and broader protections than does the federal constitution.” Hardaway, 307 Mont. at 151, 36 P.3d at 910. Alabama’s constitution has no corresponding provision, and Dardy does not argue that Alabama’s constitutional provisions provide him with broader protections than does the federal constitution.
Furthermore, the factual situation in Harda-way is distinguishable from the instant case. In Hardaway, “the police knew that the blood they swabbed and sent in for analysis was Hardaway’s blood, and not the blood of a victim that could be washed away unless taken at once.” 307 Mont. at 158, 36 P.3d at 914. Montana has subsequently recognized that exigent circumstances exist when, like Dardy’s case, it is suspected that the blood that is the object of the search is the victim’s blood. See, e.g., State v. Madplume, 335 Mont. 290, 294, 150 P.3d 956, 959 (2007) ("Herein lies the critical distinction between Hardaway and the case before us. A warrant-less search of Hardaway’s hands was not necessary, as there was no exigency. The swabbed evidence in Hardaway was Harda-way's own blood, and the officers knew it. There was no danger that Hardaway would destroy evidence necessary to establish the crime, because the blood evidence could be obtained from Hardaway at any time, once a warrant had been secured. Given the absence of any exigency, there was no basis under the statute for conducting a warrant-less search. This being the case, a warrant was necessary. In this case, by contrast, the evidence sought was not a sample of Mad-plume’s always-available DNA, but the DNA of his victim.”).

. Detective Converse testified specifically that he decided to obtain the blood swabbings because "[t]he nature of the crime that appeared that he may have committed at that time was pretty heinous and I would not have put it past him to go to any lengths to destroy that evidence and I did not want to give him that opportunity.” (R. 46.)